USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _4/14/10_

**UNITE STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

06 Civ. 5365  (RPP)

John Y. Kim,

Plaintiff,

-against-

Columbia University,

Defendant.

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS PURSUANT TO LOCAL CIVIL RULE 56.1 IN OPPOSITION TO COLUMBIA UNIVERSITY'S MOTION FOR SUMMARY JUDGMENT**

PRO SE OFFICE

I, plaintiff *pro se* John Y. Kim, pursuant to Local Civil Rule 56.1, respectfully submit this statement of material facts in response to the statement of purportedly undisputed material facts submitted by defendant Columbia University.

1.   **Admit in part, deny in part.**   Contrary to defendant's conclusive Aff. ¶4, there is no "special act of legislature" that formed Columbia.   Updike was not and is not a legislator to have personal knowledge; nor does he point to any "special act of legislature that formed Columbia."

     Royal Charter under King George II of England established King's College in 1754 which was renamed Columbia College in 1784.

     And the first Columbia College class to admit women was not until September of 1983, even though the Title VII of Civil Rights Act of 1964 had been the law of the land prohibiting discrimination for nearly nineteen (19) years at the time in 1983. **Exhibit 1**

2.   **Admit** that Columbia Business School (established in 1916), like the School of Law, (est. in 1858) or the College of Physician and Surgeons (est. in 1767), is one of many Schools of Columbia University. **Exhibit 1**

3.     **Admit** that I am an Asian American. And that I was born on September 26, 1948. I am, therefore, member of protected group for the purpose of Age and Racial Discrimination Complaint in this case.

4.     **Admit in part.**     I worked full time at Columbia beginning 1986.

5.     **Deny.**     I was appointed as an Administrative Officer of Columbia University in 1998.

Every academic year (July 1 to June 30) since the appointment to University Officer in 1988, I received, on a yearly basis, a <u>letter of continued appointment</u> and salary increases from the Dean's office of Columbia Graduate School of Business that used to be sent by the Secretary of Administration of Columbia University.

And Policy Number 113.3 Policy Title: Discharge, clearly dictate that "Discharge is a termination initiated by the University **for Cause**." **Exhibit 3 (Policy No. 113.3: Discharge)**

As an Officer of Columbia University who receives "letter of continued appointment" on a yearly basis, <u>there is a contractual limitation</u> on Columbia's right to terminate its at-will employment based upon Policy Numbers 113 and 113.3 in combination with the "letters of continued appointment" received yearly for the Officers of Administration sent by the Dean's office that used to be sent by the Secretary of Columbia University.

Therefore, the Officers of Columbia University who receive "letter of continued appointment" on a yearly basis can only be terminated for "cause" or such Officers of Columbia University would not be terminated except for "cause." **Exhibit 2 (Letter from Secretary: 3/28/1988; Salary Increase and Continued Appointment from Dean's Office 6/3/1988; 5/31/89; 6/21/90; 6/3/91)**

6.     **Admit in part, deny in part.**    Admit that all, estimated fifteen thousand (15,000), employees at Columbia, "comport themselves according to generally accepted rules of conduct and organizational behavior."

However, defendant unlawfully "Discharged" me from employment <u>without cause</u> in violation of Policy No. 113; Policy No. 113.3; and Policy Number 601, Policy Title: Discipline under the veil of pretext of less punitive "<u>Release</u>."

Specifically, when defendant unlawfully suspended me without investigation and discharged me from my employment on the day defendant instructed me to report back to work without the prior knowledge and concurrence of the Vice President for Personnel Management is a violation of Policy 601:

> "...Any suspension or discharge should be coordinated with the Personnel Office, and no discharge shall be effective without the knowledge and concurrence of the Vice President for Personnel Management." **Exhibit 3 (Policy No. 601 Discipline); Exhibit 36 Haggard Dep. 41-43**

Sacks, admitted that he had no knowledge of Policy Number 601 Titled: Discipline; he never heard of it, even though he, as executive director responsible for the welfare of employees, has supposedly consulted Carr and Lewis. **Exhibit 37 Sacks Dep. 58-60**

7.     **Deny.**    I was not "released." **See ¶8 below** I was unlawfully intimidated and threatened to be "fired" or otherwise unlawfully and discriminatorily "Discharged" <u>without cause</u> on April 6, 1992, unless I signed the letter of "release" in violation of Columbia University's Personnel Policy Manual Policy No. 101 Policy Title: Non-discrimination and Affirmative Action; and Policy No. 113 Policy Title: Termination of Employment, and Policy No. 113.3 Policy Title: Discharge which state in sequence:

> **Policy No. 101**
>
> In order to maintain its commitment to this policy, and to provide equal employment opportunities (in compliance with Executive Order 11246

3

and the Civil Rights Act of 1964 as amended), the University has instituted an Affirmative Action Program.

**Policy No. 113**

To insure that employees are not subjected to arbitrary or discriminatory procedures in the termination of their employment, all cases involving a layoff, release or discharge should be discussed with Vice President for Personnel Management or a designee prior to the department's notification to the employee.

**Policy No. 113.3**

A discharge is a termination initiated by the University for Cause including, but not limited to insubordination, excessive absenteeism or lateness, falsification of records, illegal acts, repetition of behavior for which an oral or written warning was given or violation of published Personnel Policy. An employee who is discharged shall not be employed elsewhere within the University. An employee who is discharged will receive vacation pay for earned, unused vacation days and Floating Holidays. **Exhibit 3**

8. **Admit in part, deny in part.**   I admit that "discharge" is a "termination **for cause.**" I was unlawfully "discharged," not "released" as defendant falsely claims; there is no document or testimony, or any other evidentiary material to support defendant's claim of alleged "release," as defined in Policy Number 113.2, for my unlawful discharge.

Specifically, defendant failed to provide and failed to show:

(i)    Any evidence of job transfer to a "lower job classification.

(ii) Or any evidence of determination by Vice President for Personnel Management, prior to April 6, 1992, as defined in Policy No. 113.2: Release. **Exhibit 3 (Policy No. 113.2: Release)**

The only material provided by defendant addressing its alleged "release" is the "letter of Release" dated April 6, 1992 (which I did not sign) that was promptly withdrawn by defendant on April 30, 1992. **Exhibit 15 (Letter of Release: April 6, 1992); Exhibit 9 (Letter: Mocha to Kim April 30, 1992)**

Most egregiously, defendant had deceptively and maliciously noted "**not eligible for rehire**" on my Personnel Action Form in my permanent personnel file. The punitive term "not eligible for rehire" is reserved for Discharge and not described in (i) or (ii) of Release. **See Exhibit 10 (PAF Form)**

It is, however, described in Policy No. 113.3 Discharge that: "<u>…An</u> <u>employee who is discharged shall not be employed elsewhere</u> <u>within the University</u>." **Exhibit 3 (Policy No. 113.3: Discharge)**

Accordingly, I was unlawfully "Discharged" without Cause as defined in Policy No. 113.3. - NOT RELEASED as the defendant is falsely claiming.

9.    **Deny.**    Policy No. 113.3, Policy Title: <u>Discharge</u> specifically state that: "A discharge is a termination initiated by the University for "<u>Cause</u>…" **Exhibit 3 (Policy No. 113.3: Discharge); And -See ¶ 5 above**

10.    **Admit in part.**    I started work full time as a consultant at the Dohr Computer Center of Columbia University Graduate School of Business a few months prior to begin taking courses and enrolling as a student in 1986.

11.    **Deny.**    It is not true that my work started "…shortly after enrolling as a student at Columbia." **(-See ¶10 above)** Before taking courses and enrolling as a student, I started work full time at the Dohr Computer Center of Columbia University Graduate School of Business as a consultant helping MBA, PHD students with their software and assisting Faculty members and Research fellows with their computing requirements.

12.    **Admit** that I was hired as Local Area Network Coordinator; a support staff (Local Union 2110) position at grade 8 with an annual salary of $19,000. All full time employees of Columbia University receive tuition benefits, among other benefits, as part of their compensation. **Exhibit 3 (Policy No. 304.1: Tuition and Scholarship for Officers and their Dependents)**

13.    **Admit in part.**    Defendant has clustered or clumped together multiple issues and dates into one singe sentence in the hopes that plaintiff will provide a response that will by-pass or miss the "at-will" issue inherently embedded in this deceptive statement purported to be undisputed fact.

There is a contractual limitation on Columbia University's right to terminate its at-will employment for Columbia's Officers of Administration who receive "letters of continued appointment" and salary increases annually based upon Policy Numbers 113 and 113.3 in combination with the "letters of continued appointment" and salary increases sent by the Dean's office that used to be sent by the Secretary of Columbia University.  **See ¶5 and Exhibit 2; Exhibit 3 (Policy 113; Policy 113.3)**

Defendant is making a needless effort to confuse and cloud the timeliness of annual salary increase notice contained in a letter of continued appointment I received annually as an Officer of Columbia University.

Every academic year, starting 1988, when I was appointed Administrative Officer of Columbia University, I received a letter of continued appointment and salary increase for the each and every upcoming academic year, on a yearly basis (usually in may or June), from the Dean's office of Graduate School of Business that used to be sent by the Secretary of the Columbia University. **Exhibit 2 (letters) (-Note: Academic Year: July 1 to June 30)**

14.    **Admit** that I was promoted to Manager of Microcomputer Systems on July 1988; a Columbia University Administrative Officer's grade 10 from a Support Staff (Local Union 2010) grade 8 position. **Exhibit 2 (Letter: 6/3/1988)**

15.    **Admit in part.**    I was appointed by the Secretary of the Columbia University as an Administrative Officer of Columbia University in 1988. I was the only Asian American Officer of Administration in the history of Columbia Business School graded 12 or above at the time I was unlawfully terminated from my employment in April 1992. **Exhibit 2 (Letter: 3/28/89; 6/3/1988)**

16.  **Admit.**    My salary increased approximately 47% from $19,000 to $28,000 in July1, 1988. **Exhibit 2 (Letter: 6/3/1988)**

17.  **Admit.**    My salary increased approximately 20% from $28,000 to $33,500 in July 1, 1989, as Manager of Microcomputer Systems of Graduate School of Business, Columbia University. **Exhibit 2 (Letter: 5/31/1989)**

18.  **Admit in part, deny in part.**    On February 1990, the central University Compensation and Benefits Department approved and rated my job description at a grade 13 or 14. However, Gerald Lewis (Associate Dean of Administration in the Business School at the time) sent it back to the University Compensation Department to down grade it to grade 12. My job description came back re-rated on May 7, 1990 at a lower grade 12. However, when I first complained in 1987 that my job description deserved a higher grade and higher compensation, I was informed at the time that whatever the University Compensation and Benefits Department rated the job description was to be accepted by the Business School and there is nothing one can do about it. **Exhibit 5 (Job Description); Exhibit 40 Tr. P. 2541**

19.  **Deny.**    I was not promoted to grade 12 from Grade 10 on February 1, 1989. My Assistant Director's job description had not been approved for compensation until May 7, 1990. (See ¶18 above) **Exhibit 5 (Job Description); Exhibit 2 (Letter: 6/21/1990)**

20.  **Deny.**    My salary did not increase from $33,500 to $40,000 on February 1, 1990. **See ¶ 18 and ¶ 19**

21.  **Admit in part.**    My salary increased from $33,500 to $42,000 on July 1, 1990. Increase of approximately 20% from $33,500 to $42,000 was effective July 1, 1990.  **Exhibit 2 (Letter: 6/21/1990)**

22.  **Admit in part.**    Beginning July 1, 1991, I received Officer's minimum salary increase of 5% from $42,000 to $44100. **Exhibit 2 (Letter: 6/3/1991)**

23.     **Admit in part.**    Richard Sacks did write a letter to William Scott on January 30, 1991 after having neglected for period of approximately over six (6) months of my request for housing, which he agreed to after several discussions, to obtain Columbia housing for me.

Sacks knew that I had to initially vacate the student apartment that I was occupying as a room mate of MBA student couple who were graduating by end of January 1991. Sacks wrote the letter on his return from travels the day before the last day in January.

However, the MBA student couple decided to stay until end of March 1991 to prepare to move to Switzerland because they received a promising job offer.

Sacks understood and I reminded him, once again, that I had to vacate the apartment for certain by the end of March 1991. **Exhibit 4 (Letter Sacks to Scott 1/30/1991); Exhibit 4 (Letter Maher to Kim; 4/4/1991); Exhibit 40 Tr. P. 1060-1062; 3/19/2003**

When Sacks failed again (even though I requested and reminded Sacks every Friday) at the end of March 1991, I reminded Sacks that he was being irresponsible and that I had visited the Dean's office during a meeting where Sacks got angry for going over his head and wrote a fraudulent letter right after the meeting and handed it to me in the hall was out side of my office on March 27, 1991.

24.     **Admit in part**.    All full time members of Columbia University Officers (and their qualified immediate family members) are entitled to tuition benefit, among other benefits) as part of their compensation. I took courses in the evenings when I could; but I basically had to put my education on hold because of over-whelming work load that was continually and dramatically increasing at the time due to ever advancing and changing digital and computer technology. **Exhibit 2 (Policy No. 304.1: Tuition and Scholarship for Officers)**

25. **Admit in part** that I was partially trained at Unisys. Paid for by Unisys multi-million dollar educational-grant that was negotiated by, my supervisor at the time, Assistant Dean and Adjunct Professor of Business School Antonio D'Amato in conjunction with Corporate Relations Department of Columbia Business School. (See Bottom Line, Business School news paper dated October 24, 1988) **Exhibit 11 (Bottom Line 10/24/1988; Letter: 5/31/1989)**

26. **Deny.** I was <u>at all times</u> a dedicated and loyal employee. Because of ever increasing work load, I even had put my education on hold for nearly five (5) years and I also did not take any vacation for five (5) consecutive years except for fifteen (15) days in 1991 and I have not even been paid for those years to this date. Also see the content of Richard Sacks letter dated January 30, 1991 mentioned in ¶ 23 above.

   For the dedication and tireless efforts, I received letters of appreciation for "job well-done"; mentioned in the Business School news paper "The Bottom Line;" from various members of Columbia Business School Community. I also included various memos from faculty and administration during my tenure. **Exhibit 6 (Letters Harris to D'Amato 1/28/1988; Harris to D'Amato 10/19/1988; D'Amato to Kim 10/20/1988); Exhibit 11 (Bottom Line 10/24/1988)**

27. **Admit in part, deny in part.** Admit that I was Assistant Director. Deny that I was "released" when in fact I was unlawfully "discharged" from my employment on April 6, 1992 (the day I reported back to work after two week suspension as directed) for not agreeing to sign the "letter of Release" which offered me six months salary in exchange for releasing defendant from all claims of prohibited employment discriminatory acts. Rona Carr, the director of human resources threatened to fire me by saying "…if you don't sign that letter, you're fired or terminated." I did not sign that letter; I was "fired" or discharged without cause. **See ¶ 7 above; ¶ 8**

   I was the only Asian American University Officer of Administration in the history of Columbia Business School who was at least grade 12 or above, at the time of my unlawful employment termination that was carried out

9

behind my back, in my absence, under the veil of pretext of fabricated facts concocted by defendant because of my race and because of my age to be replaced by persons of non-Asiatic ethnicity who were younger with less job experience.

28.   **Deny.**   I was the only Assistant Director when I was unlawful terminated from my employment. **Exhibit 22 (List of Employees)**

29.   **Deny.**   In February 1990, I was reporting to Assistant Dean and adjunct Professor Tony D'Amato who was the Director of Computing and Information Services Department of Columbia Business School. **Exhibit 40 (Tr. 836-837); Exhibit 18 (D'Amato memo 7/1/1990; 10/30/1990); Exhibit 5 (Job Description)**

30.   **Deny.**   This is a complete fabrication of facts concocted by Richard Sacks (including statements in ¶¶ 30-42) who testified for the first time since he resigned from Business School in June 1991 (nearly twelve (12) years later) on March 19, 2003 and again on September 14, 2009 (18 yrs. Later) after having reviewed all materials in this case and represented by no other than defendant's attorneys Barbieri and Updike.

> Q:   Did you subsequently learn that Mr. Kim was suspended?
> A:   No.
> Q:   Did you learn that he was terminated?
> A:   No.
> Q:   Did Rona Carr contact you in and around the March, April or May period to discuss Mr. Kim after you had left as executive director?
> A:   You mean a year later?
> Q:   Yes.
> A:   Not to my recollection, but I guess it's possible. **Exhibit 40 Tr.862; 3/19/2003**

There was not one single occasion of "discussing Mr. Kim's difficulties in getting along with co-workers" as falsely alleged "within the first six months of his tenure." I was not even reporting to him directly at the time. I was reporting to Assistant Dean D'Amato during first six months of his tenure. **Exhibit 18; See ¶ 29** There is no testimony from Sacks imaginary "co-workers."

Sacks failed to name one single "co-worker." There is no memo; no letter or any other material fact(s) supporting these false allegations. **Exhibit 40 Tr. 1047- 1048; See ¶30**

31.     **Deny.**     This is a complete fabrication of facts concocted by Richard Sacks 12 years after the fact. I did not "yell or scream" at co-workers. And there is no memo; no letter or any other material fact(s) supporting this false allegation. **Exhibit 40 Tr. 1047- 1048; See ¶30**

32.     **Deny.**     This is a complete fabrication of facts concocted by Richard Sacks 12 years after the fact. There is no testimony from any person supporting Sacks fabricated allegations of "some" incidents and "…other incidents." And there is no memo; no letter or any other material fact(s) supporting this false allegation. **Exhibit 40 Tr. 1047- 1048; See ¶30**

33.     **Deny.**     This is a complete fabrication of facts concocted by Richard Sacks 12 years after the fact. There is no testimony from any alleged "female student employee" among hundreds of "female student employee(s)" at Columbia University. I did not screamed at alleged "female student employee," whom ever she may be.  And there is no memo; no letter or any other material fact(s) supporting this false allegation. **Exhibit 40 Tr. 1047- 1048; See ¶30**

34.     **Deny.**     This is a complete fabrication of facts concocted by Richard Sacks 12 years after the fact. There is no statement from "the woman" or any other "woman" witnesses or any other evidential material fact(s) like a letter, or a memo to support Sacks fabrication. **Exhibit 40 Tr. 1047- 1048; See ¶30**

35.     **Deny.**     This is a complete fabrication of facts concocted by Richard Sacks 12 years after the fact. There is no testimony from fabricated alleged "male co-worker" or any other witnesses or any other evidential material fact(s) to support Sacks fabrication. **Exhibit 40 Tr. 1047- 1048; See ¶30**

36. **Deny.**   This is a complete fabrication of facts concocted by Richard Sacks. Sacks did not identify one single person or "co-workers" that allegedly complained to Sacks 12 years after the fact. And there is no testimony from any other witnesses or any other evidentiary material fact(s) to support Sacks fabrication. **Exhibit 40 Tr. 1047- 1048; See ¶30**

37. **Deny.**   This is a complete fabrication of facts concocted by Richard Sacks. Sacks and I did not have any conversation or "advice" regarding alleged fictions of "blatant uncivil behavior" or any other alleged fabrications of facts contained in this paragraph while he was employed at Columbia Business School until he resigned in June 1991; it is simply not true. **Exhibit 40 Tr. 1047- 1048; See ¶30**

38. **Deny.**   This is a complete fabrication of facts concocted by Richard Sacks. I did not miss a day of work nor have I ever been late to work during my entire tenure at Columbia University, Graduate School of Business. In fact I worked five years without taking a vacation except for 15 days in May, 1991. **Exhibit 40 Tr. 1047- 1048; See ¶30**

39. **Deny.**   This is a complete fabrication of facts concocted by Richard Sacks. I did not miss a day of work nor have I ever been late to work during my entire tenure at Columbia University, Graduate School of Business. **Exhibit 40 Tr. 1047- 1048; See ¶30**

40. **Deny.**   This is a complete fabrication of facts concocted by Richard Sacks. I did not miss a day of work nor have I ever been late to work during my entire tenure at Columbia University, Graduate School of Business. **Exhibit 40 Tr. 1047- 1048; See ¶30**

41. **Deny.**   This is a complete fabrication of facts concocted by Richard Sacks. I did not miss a day of work nor have I ever been late to work during my entire tenure at Columbia University, Graduate School of Business. Sacks did not "counsel" me and we (Sacks and I) did not have any

discussion about "notifying him about my whereabouts." **Exhibit 40 Tr. 1047-1048; See ¶ 30**

42.     **Deny.**    This is a complete fabrication of facts concocted by Richard Sacks. I did not miss a day of work nor have I ever been late to work during my entire tenure at Columbia University, Graduate School of Business. **See ¶ 43 below and ¶ 30**

43.     **Deny.**    This is a complete fabrication of facts concocted by Richard Sacks. The letter dated March 27, 1991 was not about alleged inappropriate and uncivil behavior towards co-workers as admitted by Sacks on May 29, 2003. **Exhibit 40 Tr. 2099 Line# 3-20** Defendant wasted ¶ 31-¶ 42 just to arrive at this ¶ 42 to appear cosmetically _as if_ it happened, but they are all fabrication of facts concocted by Sacks. The letter dated March 27, 1991 was written in anger after I notified Sacks that he had neglected for period of approximately over six (6) months to obtain housing for me and that I needed to have an immediate emergency housing because I was being evicted in few days and I had nowhere to even store my belongings because the MBA student couple were moving to Switzerland (I had already informed Sacks regarding this situation back in January, 1991). And I told Sacks that I had contacted Dean's office to convey Sacks negligence and irresponsibleness as my supervisor regarding this housing situation for over six (6) months period. **Exhibit 40 Tr. 1047-1048; Tr. 1060-1062; Exhibit 40 Tr. 2099; Exhibit 4 (letter Sacks to Scott 1/30/1991; Exhibit 4 (Letter Maher to Kim 4/4/1991); See ¶ 23**

44.     **Deny.**    Richard Sacks did write a fraudulent letter dated March 27, 1991 based on fabricated facts. There is no copy of the draft of the letter. **See ¶23; ¶30; ¶43**

45.     **Admit in part, deny in part.**    Admit that Rona Carr was Director of Human Resources of Department (one of 17 or 18 other departments) at the Business School, not of the University.

However, Carr, who was hired in 1990, **Exhibit 34 Carr Dep. P 4-5** repeatedly ignored and violated published Columbia University policies and procedures which negatively resulted in hiring unqualified personnel such as Haggard (who did not even meet the minimal requirement of a Master's degree for the executive director position) who perpetrated unlawful discriminatory practices with reckless disregard for the prohibited acts on minority victims such as Bonnie Simms (a black woman in her late fifties who had been at the Computer Center five (5) years before Haggard was hired) and plaintiff, a dedicated and loyal employee who had been there (at the Business School) for at least four or five years prior to Carr was hired at the Columbia Business School. **Exhibit 36 Haggard Dep. P. 4); Exhibit 13 (Job Posting: Exec. Director 5/6/1991); Exhibit 36 Dep. P. 62-63)**

Carr failed to adhere to Columbia Policy # 101.4: Administrative Monitoring Committee which was established in relevant part:

…As part of its commitment to equal employment opportunity and affirmative action, the University has established an Administrative Monitoring Committee.

The Committee's chief function is to review the recruitment, search for and selection of all candidates for administrative positions at Grade VIII (or the equivalent) and above.

The Committee, in its review, ensures that established procedures were followed and that the <u>minimal requirements</u> as stated in the job requisition and posting <u>have been met by the selectee</u>.

No offer of employment shall be made for an administrative position at Grade VIII or above without the prior review of the Monitoring Committee. **Exhibit 13 (Job Posting: Exec. Director 5/6/1991)**

46. **Deny.**      There are no other letters in evidence that Sacks allegedly wrote since 1987 to examine whether he "never had to write a letter like the Final Warning"; maybe he did, maybe he did not. **-This cannot be undisputed fact.**

Moreover, Sacks wrote the letter dated March 27, 1991 in anger after I informed him I was in contact with the Dean's office regarding his irresponsiveness in neglecting my desperate housing situation which he was aware of for at least six (6) months. **See  ¶23; ¶43 and ¶30**

47.  **Deny.**  Sacks did not provide names, addresses and descriptions of "all the people under his supervision." I, at no time, "behaved in manner" falsely alleged by Sacks. –See   ¶¶ 46 above and ¶ 48 below and see ¶30

48.  **Deny.**  Richard Sacks completely fabricated alleged "work place argument" that did not happen. There is no recording of "Kim's tone and volume of his voice." Furthermore, Sacks admitted that the "letter of March 27, 1991" was not about alleged "work place arguments. It was about his fabricated alleged "missing days or absenteeism."

> **Q:**   Did you write a letter describing these two incidents?
>
> **A:**   The letter I recall writing to you that I testified about in my previous testimony, which I believe is on evidence, was not specifically about those two incidents. It was a letter issuing a warning because it followed a second period of, you know, sort of sudden and unexpected absences...
>
> **Exhibit 40 Tr. 2099 Line# 21-25; P. 2100 Line# 1-11; Tr. 2099 Line# 3-20**

49.  **Deny.**  This is utter nonsense. Richard Sacks wrote a fraudulent letter based on fabricated facts on March 27, 1991, a few months prior to his resignation as executive director at the end of June 1991 and five (5) days before Sacks hired Haggard on April 1, 1991. Sacks is trying to make it appear cosmetically as if the fabricated content of his letter, written in March 27, 1991 under a completely unrelated set of circumstances (Sacks failure at resolving my desperate housing situation for nearly 6 months), has any merit in 2010 to support the allegations of misconduct of March 19, 1992 fabricated by Haggard, whom Sacks personally hired in 1991 despite the fact that Haggard, (a part time student employee at the time) didn't even have a master's degree which was the minimal requirement for the executive director's position (Haggard has a BA from University of Central Florida). And to support the allegation fabricated by Haggard and <u>Clark</u> whom Sacks also hired. **Exhibit 40 Tr. P.2221-2223** But the fraudulent letter based on fabricated facts is what it is. Besides, Sacks admitted that the letter wasn't even about those incidents.   -See all ¶¶ above;

50.    **Deny.**    The fraudulent letter dated March 27, 1991 based on fabricated facts does state that it is a final warning. However, you cannot issue a final warning based on fabricated facts when there is nothing factually to warn about.  -See all ¶¶ above

51.     **Deny.**    I stated that the letter stated what it stated. However, fraudulent letter based on fabricated facts does not suddenly become legitimate facts because I answered a hypothetical question asked by a lawyer.

52.    **Admit in part.**    I admit that Haggard replaced Sacks as the Executive Director.

         However, Haggard did not have the requisite qualification. Haggard did not go through the rigger of job application process.

         Haggard did not even meet the <u>minimal requirement</u> for the position of executive director which at the minimum required a Master's Degree or a preferred PHD. Haggard has neither.

         Haggard has a Bachelor's degree from University of Central Florida in 1983. Exhibit 36 Haggard Dep. P.4; 7-15; Exhibit 34 Carr Dep. 25-27

53.    **Deny.**    There was no such policy in existence prior to April 6, 1992, the day of my unlawful discharge from employment. Haggard fabricated the entire paragraph after April 6, 1992 to cover-up his unlawful employment termination perpetrated upon an older, dedicated Asian employee to hire younger, non-Asiatic persons. Haggard has yet to present a legitimate "Department-wide policies" Haggard allegedly "instituted." I as a *pro se* plaintiff perhaps may be able to respond after reviewing the document. As is, this cannot be established as undisputed fact.

54.    **Deny.**    Clark was a MBA part time student employee hired personally by Haggard (just as Haggard was hired personally by Richard Sacks even though Haggard did not even meet the minimum qualification of having a Master's Degree for the executive director's position), as RA (research assistant), even though there is no research done at our Information and

Computing Department; our (Computing) department did no "accounting" research. See ¶¶ above

Haggard also gave Clark tuition exemption worth in access of more than $35,000 which no other part time MBA student employee received. Haggard created this position for Clark only.

Clark did not apply for this position and she did not compete for this position (the position was not posted; the position was not open to anyone else); all other MBA students at the Business School were potentially deprived of a chance to get their tuition exempted.

There were many other qualified MBA students who were former / current MDs, Bank Executives, Attorneys, Investment Bankers, Engineers, Poets, Artists, Musicians, Computer Scientists…etc. Exhibit 19 (Incoming MBA Candidates: Randomly Selected)

Moreover, there is a Department of Financial Planning that exclusively handled all of Columbia Business Schools' financial matters such as accounting (accounts payable, accounts receivable, payroll, petty cash, travel vouchers and the final approval for any purchasing by the Business School).

It is the Financial Planning Department in conjunction with Dean's office that was in charge of rest of the seventeen different Departments including the computing department for all financial matters.

55.    **Deny.**    Haggard never spoke to me about alleged "frequent failure" to follow Department purchasing policies and procedures" prior to April 6, 1992, the day Haggard unlawfully discharged me from my employment, because there was no such Department purchasing policies in existence.

Moreover, it had been my responsibility to purchase computer equipment for the Business School for over several years as it is written in my job description. Exhibit 5 (Job Description); Exhibit 40 Tr. P.2527- 2529

56.    **Deny.**    Haggard's disrespectful and condescending opinion towards me, an older, more experienced Officer of Administration who was employed at

the Business School for five (5) years at the time Haggard was hired, is remarkably revealing. Haggard did not even consider my position as Assistant Director a supervisory position. **Exhibit 40 NYSDHR Tr. 1401**

57. **Deny.**       On March 19, 1992, Haggard wasn't even in his office at the time; Haggard completely fabricated all the facts. **See¶ 58 below**

58. **Deny.**       (1) Haggard testified contemporaneously on June 18, 1992 at 10:45 am in Room 418 of Lewisohn Hall, Columbia University in the presence of Prof. Burton, Mark Olson and Joseph Kissane (Grievance Committee) that: "… Mr. Haggard's hearing shouting in the office and coming out to find packing materials littering the office as if spilled from boxes and evidence that Mr. Kim had hurled a box at the office door of Vanessa Clark." In other words, Haggard did not see any box that day on March 19, 1992. Haggard adduced from "packing materials littering the office as if spilled from boxes." **Exhibit 30 (Final Grievance Committee Majority Report 10/16/1992)**

(2)   One year later, in her Columbia University's Position Statement dated March 12, 1993, submitted to Mr. David E. Powell (Human Rights Specialist who investigated my Complaint for New York State Division of Human Rights), Patricia Catapano (Associate General Counsel for Columbia University) stated that: "…Mr. Haggard was in his office when he heard the Complainant's voice raised, verbally abusing Ms. Clark. When he came out of his office to see what was happening, Mr. Haggard saw a cardboard box flying through the air and hitting Ms. Clark's office. **Exhibit 20 (Columbia University Positional Statement 1993 Page 2, ¶ 3 1993)**

(3) Three years after the fact, on January 19, 1995, Haggard brought with him a brown box containing a laser printer toner cartridge to the New York State Division of Human Rights Fact Finding Conference that was held at 55 West 125th Street, New York, NY.

I personally witnessed Haggard performing an animated demonstration of how he saw the cardboard box flying through the air and hitting the hinge of the Conference office door. Present at the

Conference were: Prof. Burton, Rona Carr, Haggard and Columbia's Associate General Counsel Catapano and New York State Human Rights Specialist/Investigator Arthur Greenidge. **Exhibit 40 Tr. 2484-2486**

59.     **Admit in part. Deny in part.**   Admit that Haggard and I agreed to meet the next day to discuss the incident.  Deny that I was "agitated."

60.     **Deny.**     Clark testified that she could not remember crying or weeping. **Exhibit 35 Clark's Dep. 34, 43** Haggard did not mention Clark "crying or weeping" contemporaneously at any time in the entire year 1992; In fact the subject of Clark crying was fabricated for the first time on March 21, 2003 nearly eleven (11) years after the fact. **See ¶58**

61.     **Deny.**     Haggard testified "…I don't believe she ever said that he threw the box at her, but I believe that she said he threw the box down the hall, and it landed outside of her office. She told me he had thrown it. **Exhibit 40 Tr. P. 1706 line# 4-9 5/13/2003**

         However, Haggard had forgotten that he found "packing materials littering the office as if spilled from boxes; evidence that Mr. Kim had hurled a box at the office door of Vanessa Clark" eleven (11) years before in 1992, when he testified under oath on May 13, 2003.

         I did not throw anything at Clark. **See ¶58**

62.     **Deny.**     Haggard fabricated the entire incident. Specifically, way in which Haggard goes from "finding packing materials" but not seeing any box in 1992, to actually seeing "a cardboard box flying through the air and hitting Ms. Clark's office" a year later in 1993, and again seeing a box flying through the air three years later in 1995, is just tooo amusing and comically fantastic to be logical or to be believed, let alone even considering it as a purported undisputed fact. **See ¶58; ¶ 60; ¶61**

63.     **Deny.**     There is no testimony from Clark in her deposition taken under oath on September 15, 2009, that she received anything from FedEx. When asked where the packages came from at her deposition, Clark testified "…I

don't recall. It was probably just sitting there as most of the equipment was." **Clark Dep. P. 22, line# 13-14.**

"…I told you I don't recall. It was either there waiting for me to be matched up to IPO or the packing slip was on my desk. I don't recall." **Clark Dep. P. 24, Line#7-10**

64.   **Deny.**       These are fabrication of facts. Carr never said anything regarding "violent outbursts" in the past nearly eighteen (18) years. Carr did not mentioned it in her letter of Suspension dated March 23, 1992; Carr did not mentioned it in her Letter of Release dated April 6, 1992; Carr did not mentioned it when she was interviewed by the grievance committee on June 17, 1992; Carr did not mentioned it during any one of numerous New York State Division of Human Rights Fact Finding Conferences. Carr is clearly fabricating facts, as Haggard and Sacks, during her deposition taken on September 14, 2009; In fact, Carr did not identify who this "young woman" is among thousands of students at Columbia University at any given academic year.  **See any Grievance Committee's report submitted contemporaneously in 1992**

65.   **Deny.**       These are fabrication of facts. Clark never contemporaneously mentioned that she was "afraid of Mr. Kim" in her memorandum dated March 20, 1992, the day after the alleged incident when she was asked to write down what happened while things were <u>still fresh in her mind</u>. **Exhibit 40 Tr. P.1355 Line#5-11** Clark never mentioned it when she was interviewed by the grievance committee on June 23, 1992; Columbia University never mentioned it in its University Position Statement dated March 12, 1993. **See any Grievance Committee's report submitted contemporaneously in 1992**

Moreover, Clark claimed she was not afraid at all. Clark testified in her deposition on September 2009 that she returned to her office the very next day to write her memorandum dated March 20, 1992. **Exhibit 35 Clark Dep. P. 99 line# 19-25; P. 100, line# 1-13**

> **A:**       So I may have come into the building. I do recall that you were put on some leave on the 20[th].
>
> **A:**       And I was comfortable going back in the building at that point. So I may have done it then or may have written it there.

> **Q:**   On the 20[th]?
>
> **A:**   On the 20[th].
>
> **Q:**   So, in any case, the memo was written on the official stationary inside the Columbia Business School, correct?
>
> **A:**   That is what I will have to testify to, yes.

66.   **Deny.**      Haggard fabricated the entire incident of alleged "Kim's behavior" that did not happen. Haggard allegedly consulted Carr and Lewis regarding something that did not even happen, like the non-existing "department policy" that Haggard and Clark fabricated after the fact.

67.   **Deny.**      Lewis was not even present at the School during the Spring Break; Lewis was not on the second floor as Haggard falsely testified; According to Haggard, he received advice from a person that was not present in the Business School and not on the second floor of Business School on March 20, 1992.

> **Judge Bowden**: Relative to your office where was Gerry Lewis's office?
>
> **Haggard:** At the time I believe he had moved to the front suite on the second floor. So, it would have been down the hall and around a couple of corners. **Exhibit 40 Tr. 1709, lines 10-16; 5/13/2003**
>
> **Q:** On what floor was he on?
>
> **A:** I believe he was on the first floor.
>
> **Q:** And Rona Carr?
>
> **A:** She was on the first floor. **Exhibit 35 Clark Dep. P. 36; line 14-17; 9/15/2009**

Moreover, Haggard, Carr and Lewis allegedly agreeing to suspend, with no investigation, a fellow Officer of University without the prior knowledge and concurrence of the Vice President for Personnel Management is a violation of Policy 601:

> "...Any suspension or discharge should be coordinated with the Personnel Office, and no discharge shall be effective without the knowledge and concurrence of the Vice President for Personnel Management." **Exhibit 3 (Policy No. 601 Discipline); See ¶ 6**

68.     **Deny.**     This is all fabrication of facts by Haggard. On **Exhibit 40 Tr. 1351 line# 18-24,** Haggard testified falsely that Mr. Kim was "being given his suspension, his letter of suspension" on March 20, 1992 and testified that he read the letter prior to "giving it to Mr. Kim on that day. However, the letter of suspension was not even written until three (3) day later on March 23, 1992.

**Exhibit 40 Tr. P.1356 Line# 20: 3/21/2003 Barbieri asked Haggard:**

Q:     Id like to show you what has been received into evidence as Respondent's C. Do you recognize that document?
A:     Yes.
Q:     Is that the suspension letter that was previously referred to?
A:     Yes, it is.
Q:     Did you give this letter to Mr. Kim or did somebody else?
A:     I believe that Ms. Carr presented it to Mr. Kim in my presence, I believe.
Q:     Was that on this date of the meeting that you previously testified about?
A:     Yes.
Q:     Did Mr. Kim read it at the time?
A:     I don't know, I didn't notice.
Q:     Had you read it prior to Ms. Carr presenting it to Mr. Kim?
A:     Yes I did.
Q:     Did you agree with its contents?
A:     Yes.
Q:     Did you agree at the time?
A:     I did agree at the time.

However, **Exhibit 40 on Haggard Tr. 1521-1522,** a few hours later on same day during cross-examination by Kim, Haggard testified:

Q:     You stated earlier that the meeting took place March 20TH, 1992 between Rona Carr, yourself, and me, and I was presented with a letter of suspension, but you weren't quite sure as to whether or not it was inside an envelope or you were very vague in that regard, but however, you were certain that the letter was present to me; is that correct?

A:     I believe that was the case, yes.

Q:     Did you... let me point to the letter please again, top left hand corner. Could you read the date on that?

A:     March 23rd, 1992.

Q:     The meeting that took place was March 20th: correct?

A:     Yes.

Q:     So how can I have received something that was written three days later?

**A:**   As you read in the context of this letter this is confirmation of ... I believe that you were giving adequate notification of your suspension on the 20th, and this is a confirmation that is confirming and reiterating.

**Q:**   Wait, my question was to you, this letter was dated March 23, 1992, and you stated you presented this letter to me during the meeting on Friday March 20th, 1992, so I am wondering as to how you can account for the three days retrospect?

**A:**   I don't recall testifying that I presented you any letter, I believe you were given a confirmation formal letter clarifying it, I am absolutely certain, which would have followed.   **Exhibit 40 Tr. 1521-1522; Also See ¶67; ¶ 6**

69.   **Deny.**   Clark's Memorandum dated March 20, 1992 begins with "Conversation with John Kim." This statement, made contemporaneously on March 20, 1992 <u>while her memory is still "fresh</u>," does not mention "shouting"; it does not mention "her crying"; it does not mention that she was "afraid of Mr. Kim." Instead, Clark was having a "conversation with Mr. Kim." Moreover, it is Clark who admitted in her memo that <u>she was "upset</u>." **Exhibit 17 (Clark memo 3/20/1992)**

70.   **Deny.**   According to Clark's memorandum dated March 20, 1992, she was having a "Conversation" with Mr. Kim. Clark was not "afraid." She came back the very next day on March 20, 1992 to write her memo in her office inside the Business School. (**See ¶ 65 above and Exhibit 35 Clark's Dep. Page 99-100**) Clark also acknowledged that "you [Kim] were put on some leave on the 20[th]. **Exhibit 35 Clark Dep. P. 99 line# 19-25; P. 100, line# 1-13**

**A:**   So I may have come into the building. I do recall that you were put on some leave on the 20th.

**A:**   And I was comfortable going back in the building at that point. So I may have done it then or may have written it there.

**Q:**   On the 20th?

**A:**   On the 20th.

71.     **Deny.**     These are fabrication of facts. Haggard and Carr never explained the reason for my unwarranted suspension based on fabricated facts concocted by Haggard, Carr and Clark. In fact, Carr and Haggard told me to "return to work on Monday, April 6, 1992.   **Exhibit 15 (Letter of Suspension 3/23/1992); Also see ¶ 6; ¶ 67;¶68; and Exhibit 3 (Policy No. 601:Discipline) for Violation of University Policy No. 601**

72.     **Admit in part.**     I found the opened letter dated March 23, 1992 on my desk in my office that was ransacked when I returned from unwarranted suspension on April 6, 1992.

73.     **Deny.**     First and Foremost, Carr was in violation of Columbia University Policy No. 601. **Exhibit 3 (Policy No. 601 Discipline); See ¶ 6; ¶ 67; ¶68; ¶71** Carr fabricated the entire testimony nearly eighteen (18) years after the fact; she testified, for the first time in 18 years, after losing two probable cause investigations (one in 1993 and the other in 1995) by NYSDHR over three (3) year period from 1992 to 1995 since the unlawful discharge from my employment which she actively participated in. Further, Carr was terminated from her position as Director of Human Resources of Columbia Business School right after NYDHR found second Probable Cause finding against Columbia that "there is Probable Cause to believe that Columbia University has engaged in prohibited practices and still is in 1995."

     The suspension in March 23, 1992 was carried out with no investigation prior to the suspension; Carr and Haggard's actions were arbitrary, capricious and discriminatory in violation of Columbia University Policy 601. **Exhibit 36 Haggard Dep. P. 33-39: No Investigation**

74.     **Deny.**     A complete fabrication of facts after the fact. It was both Carr and Haggard on March 20, 1992, who told me to "return to work on April 6, 1992." And promised that "we'll talk about it (the alleged 3/19/1992 incident) when you return." **See ¶30-**

     This is precisely what Columbia University Policy 113 prohibits; Carr is not authorized or permitted to terminate any employee (especially a fellow

Officer of Administration) by her self, as she in fact did in this case, even "if that was what Haggard had wanted to do." University Policy 113 specifically state:

> Policy No. 113
>
> To insure that employees are not subjected to arbitrary or discriminatory procedures in the termination of their employment, all cases involving a layoff, release or discharge should be discussed with Vice President for Personnel Management or a designee prior to the department's notification to the employee.  **Exhibit 3 (Policy No. 113)**

75.  **Deny.**       In 2003, eleven (11) years since the unlawful termination of my employment, Haggard falsely testified under oath at the NYSDHR hearing that the alleged reason for terminating my employment was the fact that he was <u>not aware of Sacks fraudulent letter dated March 27, 1991</u>, "the final warning letter" when he suspended me on March 20, 1992.

Contrary to Haggard's testimony that he was "unaware of the Final Warning until it was brought to his attention by Carr," Richard Sacks who authored the "Final Warning" letter dated March 27, 1991 testified under oath that: **Exhibit 40  Tr. 2224; 5/29/2003**

> Q:   Did you discuss with Mr. Haggard terminating me from my employment?
>
> A:   No. I believe as I said I imagine I must have kept him informed at the time I wrote this letter of what was going on and what I had written, but I don't remember anything beyond that. In fact, as I say I don't specifically remember that, but I can't imagine I wouldn't have kept him involved given his position.
>
> Q:   Is it your testimony the discussion of terminating me from my position was never had?
>
> A:   Beyond this letter? This letter says if there was one more incident you would be terminated. So I'm sure I told him that.
>
> Q:   It's your testimony that **Mr. Haggard was aware that this was a letter stating a final warning?**
>
> A:   **I can't imagine that I wouldn't have told him that.**
>
> Mr. Kim:       Thanks for coming.
>
> Exhibit 40 Sacks Tr. 2224; 5/292003

**-NOTE: This is the 5/29/2003 transcript Barbieri claimed she could not locate for months until the Court Order her to produce.**

76. **Deny.**    Haggard lied again. Haggard allegedly based his termination decision base on: (1) Haggard's own fabrication of facts regarding March 19, 1992 alleged "incident with Clark" that did not happen.

(2) The fraudulent "final warning letter" which Haggard falsely claims he "had not known before." **Exhibit 40 Tr. 2224**

(3) Haggard's own false fabricated observation that he "...saw a box flying through the air and hitting Ms. Clark's office. **Exhibit 20 (P. 2 ¶3)**

(4) The contents of Clark's memo dated March 20, 1992 that clearly states contemporaneously in 1992 "Conversation with John Kim" and does not contain any alleged negative "serious behavior." **Exhibit 17**

(5) Advice and recommendations of Carr and Lewis who were both aware of Richard Sacks alleged "Final Warning" letter dated March 27, 1991, because they were allegedly consulted when Sacks wrote the letter, according to Sacks testimony. And, according to Haggard's own testimony, Lewis, who was aware of Sacks "Final Warning" letter, advised Haggard that even a "...30 days suspension without pay was too severe," on March 19, 1992. **Exhibit 40 Haggard Tr. 1512 Line#18-25**

(6) Haggard admitted that he did not personally observe any misconduct by plaintiff for approximately nine (9) months since becoming plaintiff's supervisor (before that Haggard was a part time student employee). **Exhibit 40 Haggard Tr. 1724-1725**

Haggard does not explain why Lewis would "advice and recommend" to fire me [Kim] in less than two weeks later on April 6, 1992, in my [Kim's] absence and without any investigation, regarding the same alleged subject matter that had been resolved with an unwarranted suspension for two weeks without pay with explicit instructions to report back to work on April 6, 1992 because Lewis advised Haggard that "...30 day suspension without pay was too severe." **Exhibit 40 Haggard Tr. 1512 Line#18-25**

77. **Deny.**    These baseless dramatic descriptions are complete fabrication of facts. Haggard is shamelessly engaged in creative writing 101. Haggard

testified that he personally did not observe any uncivil behavior problem with Mr. Kim while he was supervisor for nine months. **Exhibit 40  Tr. P. 1724-1728; also see ¶ 76**

| | | |
|---|---|---|
| **Q:** | Mr. Haggard, you stated for the duration of nine months there had not been a serious problem with my behavior; is that correct? |
| **A:** | That there had not been a problem that I had been made aware of, that's correct. |
| **Q:** | Did you personally notice any problems during that time? |
| **A:** | with behavior? |
| **Q:** | Behavior. |
| **A:** | I didn't personally notice behavior problems during that time. |
| **Q:** | Were you at the center prior to July 1, 1992? |
| **A:** | Was I at which center. |
| **Q:** | The computer center. |
| **A:** | Yes. |
| **Q:** | Did you notice any behavior problems while you were there before July1, 1991? |
| **A:** | I didn't personally observe any. I was not in a position to be made aware of them if I had not observed them. |

**Exhibit 40 Tr. P. 1724-1728**

78.     **Deny.**     While I was serving two week suspension without pay, Haggard ransacked my office in my absence; a clear violation of employee's privacy. Haggard ran through my personal belongings and confidential business contact information that was obtained over years through tedious negotiations and dealing with various computer and electronic technology vendors nation and world wide which was part of my job duties as described in my job description. Haggard used all that information stolen from my desk in my absence to make purchases as if it was his accomplishments.

There was no policy regarding "IPO." I did not "violate" internal, external, or any other alleged non-existing policies. **Exhibit 5 (Job description: Asst. Director; 5/7/1990)**

79.   **Deny.**      Haggard fabricated facts to make a link to allegations "outlined in the alleged "Final Warning letter" which wasn't even about Haggard's fabricated alleged "similar behavior," according to Sacks.

> **Q:**      Did you write a letter describing these two incidents?
>
> **A:**      The letter I recall writing to you that I testified about in my previous testimony, which I believe is on evidence, was not specifically about those two incidents. It was a letter issuing a warning because it followed a second period of, you know, sort of sudden and unexpected absences... **Exhibit 40 Tr. P. 2099 Line# 8-13**

Columbia University's final decision to terminate my employment, as articulated in the Grievance Committee's final Report from Joseph Kissane to Vice President Mullinix, dated October 16, 1992, that was adopted by Mullinix as "final and binding to all parties" is not based on "similar behavior outlined in the Final Warning issued to Kim" that Haggard allegedly found to have "warranted [Kim's] release from employment.

In fact, the "Final Warning letter" dated March 27, 991, doesn't even mention "violation of Departmental and University policy" at all.

Moreover, Haggard wrote to the Grievance Committee on September 24, 1992 stating that: "...*As you know, our position is and has been that Mr. Kim was dismissed for continued violation of Departmental and University purchasing policy and procedures.*" (Italics are mine for emphasis) **Exhibit 28 (Haggard Letter 9/24/1992)**

Columbia University's reason articulated for my employment termination is the alleged "violation of department purchasing policy" discovered behind my back while I was serving two week suspension instigated by Haggard. It had nothing to do with "similar behavior outlined in the Final Warning issued to Kim" that Haggard allegedly found to have warranted [Kim's] release from employment.

In fact, and, in deed, Kissane explicitly distinguished <u>Release</u> from <u>Suspension</u>; clarifying that "Release" is not "Suspension."

Haggard fabricated facts and lied under oath when he testified at the NSDHR hearing on March 21, 2003, nearly eleven (11) years after the fact. Haggard lied about not being aware of the "Final Warning letter" dated March

27, 1991 because the author of the "Final Warning" letter Sacks testified under Oath that <u>Haggard was aware of the "Final Warning" letter</u>:

**Q:** Did you discuss with Mr. Haggard terminating me from my employment?

**A:** No. I believe as I said I imagine I must have kept him informed at the time I wrote this letter of what was going on and what I had written, but I don't remember anything beyond that. In fact, as I say I don't specifically remember that, but I can't imagine I wouldn't have kept him involved given his position.

**Q:** Is it your testimony the discussion of terminating me from my position was never had?

**A:** Beyond this letter? This letter says if there was one more incident you would be terminated. So I'm sure I told him that.

**Q:** It's your testimony that Mr. Haggard was aware that this was a letter stating a final warning?

**A:** I can't imagine that I wouldn't have told him that.

**Mr. Kim:**   Thanks for coming.

**Exhibit 40  Tr. 2224; 5/292003**

**-NOTE: This is the 5/29/2003 transcript Barbieri claimed she could not locate for months until the Court Order her to produce.**

80.   **Deny.**   When I reported back to work from the unwarranted suspension on April 6, 1992 as instructed in the letter of suspension dated March 23, 1992 that I found on my desk in my office that had been ransacked, Carr told me "…if you don't sign that [letter of release], you are fired or terminated" in her office. Carr at the time did not mention anything about the incident of March 19, 1992 in fact she did not want to discuss it even though she told me we would; nor did Carr mention a thing regarding false allegation of "fabricated misconduct and uncivil behavior" which I had just been suspended for two weeks without pay with an explicit instruction to return to work: "You will return to work Monday, April 6, 1992 at your normally scheduled time. You should also consider this a final warning." **Exhibit 16 (Letter of Suspension, March 23, 1992) and See ¶ 79**

81.   **Deny.**   Haggard did hire younger, non-Asian John Ellrodt as Network Analyst and a twenty three year old Robert Landstein (23 yr) as manager of systems and network on July 1, 1992, and Skaria Thomas (23 Yr) was hired

as RA with tuition exemption worth $28,000 - $35,000 to unlawfully replace an older more experienced Asian by terminating my employment with reckless disregard for the discrimination law which he knew he was breaking. Haggard testified when asked if he was aware that discrimination was against the law. Haggard's reply: "My recollection is I believe I understood that discrimination was prohibited by law." **Exhibit 36 Haggard Dep. P. 62-63**

Joseph Kissane, the chair of the grievance committee, noted after the interview with Haggard (18 June) 1992 that Haggard "…has replaced Mr. Kim with a temporary employee and expects to make a permanent replacement at a lower grade level, probably a technician." **Exhibit 31 (Burton Dissent P. 3, Last ¶)**

Also, Prof. Burton's recollection of Haggards statement after interviewing Haggard on June 18, 1992 was that "Mr. Kim could be replaced by one of the student's right out of engineering school." **Exhibit 31 (Burton's Dissent P. 3 Last ¶)**

Skaria Thomas (age 23) was the engineering school student I've been training for two years (it was part of my job to train engineering students as described in my job description) in the "break fix" aspect of my job. **Exhibit 5 (Job Description)** Had it not been for SDHR Discrimination Investigation that started July 1992 and Probable Cause finding in 1993 as a result of my EEOC discrimination Complaint filed on July 31, 1992, Skaria Thomas would have been hired as an officer after graduation. Instead, as a disguise when the School was informed of EEOC discrimination charge, Haggard hired him not as an officer but as Research Assistant (RA) with tuition exemption worth $28,000 - $35,000 providing precisely the same services to the Business School as I had taught him for the previous two years. (There is no research conducted at Computer Department)

And John Ellrodt (age 31), "the lower grade level permanent replacement" was hired specifically along with Robert Landstein (age 23) on July 1, 1992, for the network aspect of my job. **Exhibit 22 (List of Employees)**

These discriminatory hires were unlawfully premeditated and perpetrated by Haggard behind my back and in my two week absence from

work while I was serving the unwarranted suspension that Haggard instigated based on fabricated facts with an explicit instruction to "report back to work on April 6, 1992" because Haggard's supervisor Lewis, who was aware of Sack's March 27, 1991 letter (according to Sacks), advised Haggard that 30 days suspension for the fabricated alleged March 19, 1992 incident was too severe without pay," according to Haggard.

**RETALIATION**

On June 25, 1992, the Grievance Committee after interviewing Rona Carr (June 17), James Haggard (18 June), Gerald Lewis (23 June), Vanessa Clark (23 June), and John Kim (23 June) unanimously decided that "the department's actions to release Mr. Kim from employment was not carried out according to a proper procedure." **Exhibit 23 (June 25 1992 Memo)**

June 25, 1992 was a Thursday. Within two (2) business days (Friday and Monday) on Tuesday June 30 1992, When the Business School was notified of the grievance committee's unanimous decision against the Business School, and when:

> "...The School was informed that the committee was likely to recommend some form of reinstatement, a considerable amount of activity apparently took place. The School now apparently asserted to Dr. Kissane in some meeting or conversation to which at least one member of the committee was not privy. That the crucial reason fro Mr. Kim's dismissal was the additional evidence of procedural deficiencies discovered during his absence. This evidence was summarized in the list of invoices and the Haggard's memorandum. It was at this point that the decision to release Kim was made. **Exhibit 31 (Burton Dissent 10/15/1992 p. 5 ¶ 3)**

On June 30, Rona Carr submitted a self-serving response to my Columbia University Discrimination complaint that was filed with Columbia University's Equal Opportunity and Affirmative Action to chair person Kissane. **Exhibit 24 (Carr's Memo to Kissane 30 June 1992)**

Kissane accepted and adopted Carr's self-serving response to the discrimination charges on July 2, 1992 as if it was the committee's decision.

On July 13, 1992, without other members, Kissane alone received the self-serving response on July 2, 1992 from the very people responsible for my discrimination complaint (Haggard and Carr) that I had filed with the office of Columbia University Equal Opportunity and Affirmative Action and completely reversed the committee's unanimous decision that had been decided earlier on June 25, 1992, by himself after "talking to few people about legal and personnel issues." **Exhibit 31 (Burton Dissent P. 3 top¶)**

82.     **Admit in part, deny in part.**   I did request a formal grievance procedure regarding suspension and termination. As I testified, the information came from the Department of Labor Relations when I visited immediately on April 6, 1992 and there after. The Department of Labor Relations informed me that the office of Equal Opportunity and Affirmative Action, which is located at another location on campus, handles the discrimination when I complained about the racial and age discrimination aspect of my unlawful discharge. The discrimination complaint was submitted to Vice President Early according to Columbia University Discrimination Grievance Procedure, after discussing the racial and age discrimination issues with the Director of EOAA Rosalind Fink who advised me to submit it to Vice President for Personnel Management Robert Early. **Exhibit 7 (Letter to VP April 17, 1992); Exhibit 8 (Letter to VP Early April 29, 1992)**

83.     **Admit in part.**     The discussion of discrimination started as early as April 6, 1992 when I was obtaining information from Labor Relations and speaking to VP Robert Early and EOAA Director Rosalind Fink on the phone as well as in person at their offices. After receiving policies and directions I wrote letters and filled out the necessary forms as best I could, since I was in a state of shock at the time. **See ¶82; Exhibit 8 (Letter to VP Early April 29, 1992)**

84.     **Deny.**     I was not "released." I was unlawfully discharged. Haggard, Carr and Lewis did not adhere to published Columbia University policies with reckless indifference even though they were well aware as director of human

resources and senior member of the Columbia Business School. Their actions were intentional, malicious, arbitrary and discriminatory against a descent fellow Asian Officer of University.

> Policy No. 113
> To insure that employees are not subjected to arbitrary or discriminatory procedures in the termination of their employment, all cases involving a layoff, release or discharge should be discussed with Vice President for Personnel Management or a designee prior to the department's notification to the employee. **Exhibit 3; also see ¶7,¶8**

85. **Admit** that Pursuant to Policy No. 602.2, I selected as my designee, former Dean of Columbia Business School who was familiar with my dedication and positive contributions to the Business School while he was the Dean at the School. Business School selected Mark Olson. Both Olson and Burton selected Joseph Kissane as the chair of the grievance committee.

86. **Admit in part.**    The Committee did not reach a unanimous decision. As stated in his final report, dated October 16, 1992, to Vice President Mullinix, "Joseph Kissane looked into the Discrimination Complaint separately" not as a three member panel Grievance Committee.

Further, Kissane intentionally failed to communicate with me, the plaintiff, in any way regarding the critical and sensitive issues of discrimination complained of in violation of published Columbia University Discrimination Procedure policy, nor was I provided the right granted under the Columbia University Discrimination Procedure which state in relevant part that: "…The complainant has the right to be present when the testimony is presented and to view and to rebut any evidence presented in defense of a charge of discrimination." **Exhibit 21 (Columbia Discrimination Procedure)**

Only persons contacted by Kissane, acting alone, were the very people responsible at the Business School for the unlawful discriminatory acts complained of; Carr and Haggard. Kissane, acting alone, "looked into the Discrimination Complaint separately" and concluded, with no evidence of material facts other than the self-serving comments stated in a memorandum dated June 30 1992 from Carr that he received, that there was no

discrimination. Kissane reached this conclusion within two (2) business days by himself, on July 2, 1992, after receiving Carr's memo dated June 30, 1992. **Exhibit 24 (Carr's Memo 6/30/1992)**

87.   **Admit in part.**   Admit that three member panel Grievance Committee interviewed Rona Carr (17 June), James Haggard (18 June), Gerald Lewis (23 June), Vanessa Clark (23 June), and John Kim (23 June). However, the discrimination complaint was never addressed properly; in fact it wasn't investigated at all as a three member panel Grievance Committee **See ¶ 86**.

88.   **Deny.**   Carr provided a self serving response without ever being interviewed or investigated by the three member Grievance Committee. **See ¶86; ¶87**

89.    **Deny**.   Defendant is intentionally lumping together "various drafts" in the hopes that it will cloak the inherently embedded unlawful **RETALIATION** perpetrated against plaintiff by manipulating and clouding the time line.

   (1)   **June 25, 1992:** The Committee after interviewing Rona Carr (17 June), James Haggard (18 June), Gerald Lewis (23 June), Vanessa Clark (23 June), John Kim (23 June) stated in relevant part: "Our conclusion is that the department's action to release Mr. Kim from employment was not carried out according to a proper procedure." **Exhibit 23 (Memo: Grievance of John Kim 6/25/1992**

   (2)   **June 30, 1992:** Carr submitted a self serving response to the discrimination complaint I filed with Columbia University's Equal Opportunity and Affirmative Action without any investigation or interview by the three member Grievance Committee. **Exhibit 24 (Carr's Memo: Discrimination Complaint 6/30/1992)**

   (3)   **On July 2, 1992** or before, Kissane received and adopted Carr's self-serving response to plaintiff's discrimination complaint that was filed with the Director of Columbia University Equal Opportunity and Affirmative Action Rosalind Fink as Committee's decision.

(4) **July 13, 1992:** Immediately, in less than ten (10) days after receiving the self serving discrimination complaint, the grievance committee's chairperson Joseph Kissane by himself, without any notice to me the complainant in violation of published Columbia University Discrimination Complaint Procedure and not as a three member Grievance Committee, completely reversed the unanimous decision that was reached by the grievance committee on June 25, 1992, after "talking to a few people about legal and personnel issues." **Exhibit 25 (Memo July 13, 1992)**

(5) Thus, the "*Adverse Action*" and the "*Causal*" connection have been identified and established for the unlawful **retaliation.**

90.    **Admit.**    The report of three member panel Grievance Committee's unanimous decision was:

> "Our conclusion is that the department's action to release Mr. Kim from employment was not carried out according to a proper procedure."

91.    **Deny**.    Defendant is purposefully and repeatedly lumping together July 13 and September 28, 1992 draft reports to disguise the egregious act of **retaliation** as explained in ¶89 above.

The July 13, 1992 draft report changed and reversed the June 25, 1992 unanimous decision reached by the three member panel Grievance Committee in less than ten (10) days after the receipt of Carr's self-serving response to plaintiff's Columbia University EOAA discrimination complaint by Joseph Kissane by himself.

September 28, 1992 draft report is word for word exact duplicate of October 16, 1992 final report submitted to Vice President Millinix by Joseph Kissane and Mark Olson. (No one was interviewed by the three member panel Grievance Committee after the June 25, 1992 unanimous decision by three member panel Grievance Committee finding that the Business School was at fault for improper termination of Kim's employment)

Dr. John C. Burton did not concur with the July 13 1992 draft report, did not concur with the September 28, 1992 draft report and submitted a separate dissenting final report on October 15, 1992 to Vice President Mullinix.

September 28, 1992 draft report was issued after the Committee decided to let me review the alleged evidence of Columbia University's purported non-discriminatory reason articulated for my unlawful employment termination nearly five (5) months after the termination on August 18, 1992.

On August 19, 1992, Columbia University received Discrimination Complaint from EEOC that I filed on July 31, 1992. **Exhibit 12 (EEOC Charge)**

After a careful review of the alleged evidence of my wrong doing or alleged deficiencies, I submitted my response to the Committee on September 8, 1992 and Haggard responded on September 24, 1992 by stating in relevant part:

> Mr. Kim also states that the Business School "had changed its position" on the reasons for his dismissal. As you know, our position has been that Mr. Kim was dismissed for continued violation of departmental and university purchasing policy and procedures. We did voice our concerns over Mr. Kim's history of emotional outbursts and their escalating violence as a peripheral issue, however, those concerns were not stated as the primary grounds for dismissal.   **Exhibit 28 (Haggard  9/24/92 Letter)**

### *Retaliation*

In less than 4 days after Haggard's September 24, 1992 response to my September 8, 1992 findings submitted to the Committee, Kissane drafted a report dated September 28, 1992, reversing the June 25, 1992 decision in <u>retaliation</u> for my EEOC Discrimination Complaint filed July 31 1992 and received by Columbia University General Counsel on August 19, 1992.

September 28, 1992 draft report is exact duplicate of October 16, 1992 final report that was adopted by Vice President Mullinix or the Final report dated October 16, 1992 is exact duplicate of September 28, 1992 draft report word for word verbatim.

92.     **Deny.**     The Chair of the Committee Joseph Kissane looked into the discrimination complaint separately by himself which in effect made him, at once, the Judge and the Jury and he immediately reversed the unanimous decision of the three member panel Grievance Committee within three (3) days of receiving Carr's self-serving response to my EOAA discrimination complaint after "…talking to a few people legal and personnel issues." Kissane's actions can hardly be considered to be "very serious matter." Kissane may have "devoted well over 100 hours of his time" but most of it was devoted to seriously manipulating the final outcome in favor of defendant to cover-up the prohibited act of retaliation and discrimination as charged. **See ¶¶ above**

93.     **Deny.**     The majority report of three member panel Grievance Committee's final recommendation to senior Vice President Joseph Mullinix which he adopted as the official Columbia University's articulated reason for Kim's employment termination which is  final and binding on all parties explicitly, and in no uncertain terms, state that:

> John C. Burton dissents from this report and his statement follows it.
>
> Release
>
> The issue as we first saw it, and based on Mr. Kim's letter to Mr. Early, was that the Graduate School of Business had unexpectedly released Mr. Kim from employment on the day when he retuned to work after a two week suspension. The letter of suspension had offered him an opportunity to return to work and to reform his behavior. The School's apparent neglect of the terms that it had offered raised the issue of weather Mr. Kim had been fairly treated.
>
> The testimony of the members of the Business School indicated that during the period of suspension, Mr. Kim's supervisor, James Haggard needing to continue the work of the offices, discovered from documents on Mr. Kim's desk that he was delinquent in his work to an extent not known before. The committee was given a list of invoices from October 1991 through March of 1992 showing that fewer than 50% had Internal Purchase Orders prepared for them and none had IPOs approved. The indication is that Mr. Kim had not

followed office procedure even though he had helped devise them and, in some cases, not for a long time. In an office responsible for quantities of expensive computer equipment, proper accounting procedures were a serious concern, not least of because the payment of vendors depended on proper Purchase Orders produced.

This additional information led the School to release Mr. Kim.  **Exhibit 30**

Nowhere in the final decision of Columbia University stated above is based on what Haggard, Sacks and Carr falsely alleged as the reason for my employment termination on the day that I returned to work as instructed after serving two week suspension without pay. There is no allegation of "verbally abusive" nor "yelling and screaming" nor "totally destructive" nor "absenteeism as falsely asserted by Haggard, Sacks and Carr and depicted in ¶30-42; ¶43-51; and in ¶57-80 that is articulated in the Columbia University's final decision to terminate (Release) my employment.

The Grievance Committee chair Joseph Kissane testified that Suspension is not Release.

| | | |
|---|---|---|
| **Q:** | Suspension is not a termination, is it? | |
| **A:** | I don't know the answer to that question. | |
| **Q:** | Did that particular suspension have a provision for John Kim to return to work, if you remember? | |
| **A:** | Yes. At the top of the page it says a letter of suspension had offered him an opportunity to return to work. Yes. | |
| **Q:** | Thank you. | |
| | So, therefore, suspension is not a termination, is it? | |
| **A:** | Right.          **Exhibit 39 Kissane Dep. P.43 line 14-24; 9/15/2009** | |

Joseph Kissane also testified that the final report separates Suspension from Release for clarity; he wanted to make "clear" that Suspension is not Release.

| | |
|---|---|
| **Q:** | The report separates the release from the suspension? |
| **A:** | Yes. |
| **Q:** | Was there a special reason for that? |
| **A:** | None that I recall, no |
| **Q:** | Ok. So they are separate issues? |

**A:**    I suppose we were striving for clarity.

**Q:**    Ok.

**A:**    I can't think of any other reason.    **Exhibit 39 Kissane Dep. P.63**

And Haggard stated in his September 24, 1992 letter that:

> ...As you know, our position is and has been that Mr. Kim was dismissed for continued violation of departmental and university purchasing policy and procedures. **Exhibit 28 (Haggard Letter ¶2; 9/24/1992)**

94.    **Deny.**    The three member panel Grievance Committee did not address the manner in which the discrimination complaint was investigated since there was no investigation by them. Defendant and Kissane intentionally manipulated the outcome of the Discrimination Complaint in unlawful retaliation for filing a discrimination complaint first with Columbia's EOAA and with EEOC.

**Q:**    Was there any other persons involved in the investigation of the discrimination complaint that was attached to the grievance document?

**A:**    You mean apart from Ms. Carr and Mr. Haggard? I don't recall anyone else, no. **Exhibit 39 Kissane Dep. P.63 Line #13-18; 9/15/2009**

**Q:**    In the document that is headed Columbia University Discrimination Grievance Procedure, middle column...

**Q:**    Yes. Could you read that into the record please?

**A:**    "A copy of the Complaint shall be sent to the general counsel, who will be available to provided counsel to the committee in its proceedings and to the appeal officer." **Exhibit 39 Kissane Dep. P.22 Line #14-25; 9/15/2009**

**Q:**    Thank you. Did you investigate those charges as a Committee?

**A:**    I think I have seen the report that I looked over your discrimination charges on my own since both Mr. Olson and Mr. Burton were away, so I looked into it with personnel people.

**Q:**    So, therefore, the investigation was done by you, the chairman of the committee, correct?

**A:**    It looks that way, yes.

**Q:**   And the conclusion was reached by you as well without the other two members, correct?

**A:**   I would have given them whatever information I had.

**Q:**   That is not my question, sir.

**A:**   Ok. Yes, Mr. Olson agreed.

**Q:**   When?

**A:**   After June 30.

**Q:**   Did Dr. Burton agree?

**A:**   Dr. Burton did not agree to anything.

**Q:**   So he wasn't involved in other words.

**A:**   He was involved. He was told, but he didn't agree.

**Q:**   I see. But the investigation was done by you separately from the Committee members, correct?

**A:**   Right.   **Exhibit 39 Kissane Dep. P.44-45; 9/15/2009**

**Mr. Kim:** I am showing you the witness Plaintiff's Exhibit No. 44.

**Q:**   The right-hand column, Line 3, beginning...

**A:**   "The complainant has the right to be present when testimony is presented and to review and to rebut any evidence presented in defense of a charge of discrimination,"

**Q:**   Thank you. That sentence is from where? Where are you reading that from?

**A:**   Columbia University Discrimination Grievance Procedure.

**Q:**   Was that done in this case?

**A:**   No.

**Q:**   why not?

**A:**   I don't know.     **Exhibit 39 Kissane Dep. P. 48; 9/15/2009**

95.   **Deny.**   Vice President Mullinix final decision dated December 29, 1992 was in retaliation for filing EEOC discrimination charge against Columbia by plaintiff. Former Dean Prof. Burton sent a letter dated December 4, 1992 to Mullinix reminding him of the EEOC discrimination charge filed by me and urged for a reasonable settlement. **Exhibit 33 (Burton Letter to Mullinix 12/4/1991)**

Further, Mullinix intentionally delayed sending me the final decision dated December 29, 1992 until January 22, 1992 in order to evade and to cover-up the unlawful act of Retaliation perpetrated against plaintiff for filing

the discrimination charges with EEOC. **Exhibit 32 (Letter dated 1/22/1993; Memo dated 2/19/1993; Mullinix Decision dated 12/29/1992)**

The New York State Division of Human Rights sent a verified Discrimination complaint filed with the Division of Human Rights or, deferred to the Division by the Equal Employment Opportunity Commission to Columbia University that was received on October 26, 1992.   **Exhibit 13 (NYSDHR Notice of Conference and Production of Record addressed to Associate General Counsel Patricia Sachs dated 10/21/1992 received on 10/26/992)**

96.   **Deny.**   Sacks was aware that I was Asian. He ridiculed my speech in the presence of staff and other students by turning to Haggard to "translate" my speech during open discussions. Sacks would turned to Haggard in the middle of a dialogue and say to Haggard, "What? ... What did he say?..." "What did he say, Jim?"; "What is he saying?"

97.   **Deny.**   Sacks who is younger than myself was aware of my race and was aware that I was older than him; it was one of the subject of our very first conversation when he arrived at the Business School in 1990.

98.   **Deny.**   Haggard knew that "...terminating an employee would effect and impact the lives of persons being terminated." Haggard also knew "...discrimination was prohibited by law." **Exhibit 36 Haggard Dep. 46-50; 62-63** Haggard, however, acted with reckless indifference. Haggard hired persons of non-Asiatic ethnicity in their twenties (nearly half my age) with less job experience to replace me, an Asian American employee who had more than eight (8) years of solid experience and was the only Asian American Officer of Administration who was Grade 12 or above in the history of Columbia Business School at the time in April 6, 1992.

99.   **Deny.**   Haggard as Executive Director in fact knew that I was Asian American and that I was over 40 years of age when he unlawfully terminated my employment intentionally to hire much younger non-Asian employees in his department.

100.  **Deny.**      I did not file a Complaint with New York State Division of Human
Rights. I filed a discrimination complaint with EEOC on July 31, 1992.
There after, EEOC sent the complaint to New York State Division of
Human Rights.    **Exhibit 12 (EEOC Notice of Charge of Discrimination dated 8/4/92
received by Columbia on August 19,1992)**

101.  **Deny.**      SEE ¶100 above. The EEOC charge I filed with EEOC not New
York State Division of Human Rights was sent to New York State Division of
Human Rights by the EEOC. I did not even know what Division of Human
Rights was in April of 1992.  **Exhibit 12 (EEOC Notice of Charge of Discrimination
dated 8/4/92 received by Columbia on August 19,1992)**

102.  **Admit in part.**     I did not file a Complaint with New York State Division of
Human Rights; I filed a discrimination complaint with EEOC on July 31, 1992.
It was the EEOC in-take personnel that typed the complaint after two lengthy
interviews. He left out a lot of details when he typed complaint. He told me
not to be concerned at the time because EEOC will investigate and look into
the problems discussed.

103.  **Admit.**      Admit that "work unit" meant the Computing Department.

104.  **Admit in part.**     Initially, on July 2, 1993, the New York State Division of
Human Rights found Probable Cause to believe that Columbia University
engaged in or is engaging in the unlawful discriminatory practice complained
of. Thereafter, on August 15, 1995, the DHR found Probable Cause for the
second time to believe that Columbia University engaged in or is engaging in
the unlawful discriminatory practice complained of.

105.  **Admit in part.**     Admit that the dates of the hearing October 8.9.10 and 11
2002; December 17 and 18 2002; March 19, 20, and 21 of 2003; May 13, 20
and 29 of 2003; August 19, 2003; September 4, 2003.  My count is fourteen
(14) days of hearing.

106.   **Admit in part.**   The Recommended findings were never judicially reviewed.

107.   **Deny.**   The Recommended Order was never judicially reviewed. Hearing was based on hearsay evidence according to New York Executive Law and there was no discovery; there was no subpoena. Hearsay evidence is permitted, as a rule, during the State Hearing.

108.   **Deny.**   The Recommended Order was never judicially reviewed. Hearing was based on hearsay evidence according to the State Executive Law. And there was no discovery; there was no subpoena. Hearsay evidence is permitted, as a rule, during the State Hearing.

109.   **Deny.**   The Recommended Order was never judicially reviewed. Hearing was based on hearsay evidence according to the State Executive Law. And there was no discovery; there was no subpoena. Hearsay evidence is permitted, as a rule, during State Hearing.

110.   **Admit** only that EEOC issued a Right to Sue letter.

111.   **Admit in part.**   Admit only that I filed a discrimination complaint against Columbia University on or about July 17 2006.

112.   **Admit in part.**   Admit only that I amended my complaint.

113.   **Admit in part.**   Admit only that I filed a second amended complaint.

114.   **Admit.**   I have not been employed since March 20, 1992. Columbia sabotaged my professional reputation and unlawfully "Discharged" me without cause from my employment by inserting an egregious and malicious line "**not to be rehired**" on my PAF (Personnel Action Form) **Exhibit 10 (PAF)** in my personnel file while falsely claiming to this day that I was "released" when in fact, and indeed, I was unlawfully and in violation of Columbia University's published Policy 113, 113.3 and "Discharged" without "Cause" **Exhibit 3 (Policy No. 113; 113.3)** in addition to discrimination complaint

filed with Columbia's Equal Opportunity and Affirmative Action and the United States Equal Employment Opportunity Commission.

**115.**   **Deny.**      I did produce all the information requested.

**116.**   **Admit in part.**   I admit that I have Associate Degree from Bergen Community College and BA from Columbia University.

**117.**   **Deny.**      It was the generosity of Unisys Corporation's Multi Million Dollar Education Grant that was mainly responsible for my training and education in addition to multi-million dollar educational grants from IBM; HP; AT&T; NCR after a tedious and diligent negotiations and dealings by Assistant Dean D'Amato and Columbia Business School's Corporate Relations Department (Dr. B. Dillon) prior to the arrival of Sacks and Haggard at the School.

There had not been a single grant successfully negotiated or obtained since the arrival of Sacks and Haggard thereafter in mid-1990; these ungrateful characters arrived only to reap the fruits of our labor and to ruthlessly pretend as if it was their accomplishments. Carr also started her employment in 1990 at Columbia Business School.

These unscrupulous personnel have unlawfully discharged me from my employment based on false allegations of fabricated facts; they have destroyed my professional reputation; falsely accused (and still accusing) me with fabricated facts.

Sacks resigned in June 1991 and Carr and Haggard both have been dismissed since the second Probable Cause finding by NYSDHR in 1995.

Admit that I am certified NOVELL engineer; Registered infrastructure Network Cable Designer; and LAN Administrator, among others.

**118.**   **Admit in part.**   Following unlawful discriminatory discharge by few unscrupulous personnel, I filed an EEOC discrimination complaint against Columbia University on July 31, 1992. Admit that I have a BA from Columbia University; Admit that I am bi-lingual.

119.    **Deny.**    Ludicrous. What documents would a philosophy major or Liberal Arts major produce?

120.    **Deny.**    Since the unlawful Discharge by few unscrupulous personnel at Columbia University in 1992, I have been searching diligently for employment every single day. I have made (still am) every effort to be reinstated as Assistant Director at the Business School and over the span of 18 years, devoted over hundreds of hours reviewing false allegations fabricated by unscrupulous few who are no longer part of the Business School since the second probable cause finding in 1995.

121.    **Deny.**    Defendant has a copy of my resume in its possession. **Exhibit 40 Tr. P.1000-1002**    I utilize various methods to reach potential employment. All different methods are used; there is no limitation.

122.    **Deny.**    For the year 1992, I have been searching diligently for employment every single day. In addition, I spent the rest of the year 1992 since March 20, 1992 to be paid for my 1) unpaid salary owed; 2) five years of vacation pay owed; and 3) to be reinstated back to my position as Assistant Director at Columbia University, Graduate School of Business or else where within University after I was unlawfully Discharged without cause from my employment. And these activities are very well documented; Defendant may begin by reviewing the Grievance Procedure Report which includes my Columbia University Equal Opportunity and Affirmative Action Discrimination Complaint that was not investigated.

On July 31, 1992, in a diligent effort to get my job back and not to be discriminated further and to protect and preserve my rights, I filed a verified Racial and Age Discrimination Complaint against Columbia University with The United States Equal Employment Opportunity.   **See all ¶¶ above**

123.    **Deny.**    For the year 1993, as in previous year 1992, I have been searching diligently for employment every single day. In addition, I diligently

pursued to be reinstated back to my position as Assistant Director at Columbia University, Graduate School of Business. There are numerous official letters and communications, which are well documented, from the State of New York as well as the United States Federal Government Agencies to Columbia University advising and recommending the wisdom of settlement; reconciliation; avoiding costly legal matters; specifically addressing Racial and Age Discrimination Complaint filed by plaintiff with EEOC. However, Reconciliation efforts of the Federal and State agencies which Columbia has been thumbing its nose at for the past 18 years is a serious concern.

Most egregiously, Columbia has punitively noted "**not eligible for rehire**" on my Personnel Action Form in my personnel file while deceptively claiming, to this day, that I was "Released" when in fact, and indeed, defendant unlawfully "Discharged" an Officer of Administration without "Cause."

I filed a verified Racial and Age Discrimination Complaint against Columbia University with The United States Equal Employment Opportunity on July 31, 1992.

On July 2,1993, The New York State Division of Human Rights after investigation, the "Division of Human Rights has determined that it has jurisdiction in this matter and that there is <u>PROBABLE CAUSE</u> to believe that the respondent engaged in or is engaging in the unlawful discriminatory practice complained of."

124. **Deny.**     In 1994, as in previous two years, I have been searching diligently for employment every single day. In addition, I continued diligently to be reinstated back to my position as Assistant Director at Columbia University, Graduate School of Business.

On January 1994, I graduated from Columbia University obtaining a BA after giving up almost five years of my life and had my education put on hold, to get the Business School's antiquated computer system infrastructure updated on time and within budget just to be unlawfully discharged by

unscrupulous few who had just arrived in 1990 only to reap the benefits and ungratefully pretend it was their accomplishment on the backs of dedicated and hard working employees.

Defendant has destroyed my professional reputation beyond repair by unlawfully discharging me from my employment based on allegations of fabricated facts and without cause because of my race and age. Haggard in particular, an ungrateful pretender, hired persons nearly half my age with less experience to replace me, an older more experienced Asian. One of the young persons Haggard hired to replace me was Skaria Thomas, a 23 yr old, engineering student I trained for two years.

In retaliation for filing a discrimination charge against them, the defendant, even after Probable Cause finding by the NYSDHR and after countless pre-hearing conferences of reconciliation efforts by Human Rights Investigators and Human Rights Specialists, unlawfully refused to even let me apply for the job positions that were open and available and I was qualified for the positions at Columbia University, continuously.

Specifically, Columbia Business School had an open job posting for a Manager (Hardware Services), Grade11.  **Exhibit 41 (Reference # 091994 Date 12/12/94)**

The description of position is nearly identical to services I had provided with a lower Grade level and Lower Job Title. I qualified for the position in that I was providing the same job function for the past six years at the same location (Business School).

The second open Job Posting was at the Columbia University, School of Health for a Systems Administrator, 5.  **Exhibit 41 (Reference # 6544-94 Date 12/12/94)**

The description of position is exactly same as one of many services I had been providing for the past six years at the Business School. I was qualified for the position; in particular this position required a "NOVELL" local area networks experience and I was a Certified "NOVELL" engineer.

Columbia University unlawfully did not permit me to even apply for the position I was qualified for in retaliation. The open position were mentioned

during the pre-hearing conferences and defendant adamantly refused to let me apply by falsely stating that the job was not available.

Yet another job opening Columbia unlawfully refused to make available for me to apply, even though I was qualified, was Systems Coordinator, Grade 11 at   Columbia Business School. **Exhibit 41 (Reference # 058995 Date: 8/14/1995)**

Most egregiously, defendant had deceptively and secretly noted "**not eligible for rehire**" on my Personnel Action Form in my permanent personnel file all the while deceptively stating, to this day, that I was "released." -**See ¶ 7and ¶ 8**

125.   **Deny.**      In 1995, as in previous three years, I have been searching diligently for employment every single day. In addition, I continued diligently to be reinstated back to my position as Assistant Director at Columbia University, Graduate School of Business.

> On August 15, 1995, The Division of Human Rights issued the following:
>
> > On July 2, 1993, a determination was issued by the Division of Human Rights finding that there is <u>Probable Cause</u> to believe that the respondent(s) engaged in or is (are) engaging in the unlawful discriminatory practice complained of.
> >
> > There after, on July 25, 1994, by order of Commissioner Margarita Rosa, the determination of <u>Probable Cause</u> was vacated, proceedings were re-opened for the purpose of additional investigation, as set forth in the Commissioner's Order.
> >
> > After further investigation, and following a review of related information and evidence with named parties, the Division of Human Rights Law determined the above-entitled complaint that it has jurisdiction in this matter and that there is <u>Probable Cause</u> to believe that the Respondent (s) engaged in or is (are) engaging in the unlawful discrimination practice complained of. **Exhibit 42**

Yet another job opening Columbia unlawfully refused to make available for me to apply, even though I was qualified, was Systems Coordinator, Grade 11 at   Columbia Business School. **Exhibit 41 (Reference # 058995 Date: 8/14/1995)** -**See ¶ 124**

126.   **Deny.**     In 1996, as in previous four years, I have been searching diligently for employment every single day. In addition, I continued diligently to be reinstated back to my position as Assistant Director at Columbia University, Graduate School of Business.

Yet another job opening Columbia unlawfully refused to make available for me to apply, even though I was qualified, was Systems Coordinator, Grade 11 at  Columbia Business School. **Exhibit 41 (Reference # 058995 Date: 8/14/1995) -See ¶ 124**

This time, defendant Columbia University thumbing its nose at the entire process of reconciliation and ample opportunity to mitigate damage, pre-designed and instituted by the congress in Title VII's "unfettered access to the remedial mechanism" for the sufferers of prohibited discrimination, have profoundly failed to even appear in retaliation and in defiance of law of the land.

This is significant in that re-scheduling of crowded pre-hearing dates can take months, if not longer causing additional damages that irreparable.

On August 15, 1996, defendant Columbia University failed to appear for the pre-hearing conference that had been scheduled. **Exhibit 44**

Administrative Law Judge Ferrandina said in relevant part:

> …Mr. Kim this matter was not put on for trial today. It was put on to see whether I could bring the parties together to reach an amicable settlement. Since the Division had a very large backlog of cases it may be some time before this case will come up for trial. **(The Hearing started 6 years later on October 8, 2002)**
>
> Therefore the only thing we can do here is reschedule this hearing for another date. At which time hopefully, the Respondent, Columbia University will send someone down here who had authority to discuss a possible settlement in this matter."

**The trial or the Administrative Hearing did not come up until year 2002!**

127.   **Deny.**     In 1997, as in previous five years, I have been searching diligently for employment every single day. In addition, I continued diligently

to be reinstated back to my position as Assistant Director at Columbia University, Graduate School of Business.

Yet another job opening Columbia unlawfully refused to make available for me to apply in retaliation, even though I was qualified, was Manager (Systems), Grade 14 at   Columbia Business School. **Exhibit 41** (**Reference # 970379 Date: 6/09/1997**) See ¶ 124; ¶ 125 and ¶ 126

128.   **Deny.**   In 1998, as in previous six years, I have been searching diligently for employment every single day. In addition, I continued diligently to be reinstated back to my position as Assistant Director at Columbia University, Graduate School of Business.

129.   **Deny.**   1999,2000,2001,2002,2003,2004,2005,2006,2008,2009.  As  in previous years, I have been searching diligently for employment every single day. In addition, I continued diligently to be reinstated back to my position as Assistant Director at Columbia University, Graduate School of Business.

All the tireless and frustrating efforts in diligently searching for employment daily over the years have been either lost in the flooding of storage area during the heavy rain storms or have been miss-placed and lost while I moved from places to places since being evicted from Columbia University housing.

The records and documents that I have provided are the documents that have been saved over the years. There are many companies that did not reply. The companies and corporations that were gracious enough to reply are the part of documents that have been provided (not all, only the documents saved).

The net-working of personal meetings and discussions of possible employment cannot be recorded by any documentation except for exchanging of business cards which I have provided. Defendant has these records.

And the employment search through the internet has been provided. I also made efforts in starting a company JYK Consulting which is also

provided. And in addition, I took courses in between when ever I could to be re-certified and be updated in ever changing technology industry.

Indeed, Columbia University through a few unscrupulous and ungrateful characters have, and still is, unlawfully perpetrated prohibited acts that are beyond any boundaries of human decency.

It would be amazing to say the least that any reasonable person would not be deterred from filing a charge of discrimination had the person the knowledge that it requires over eighteen (18) years of once life to get to the Federal Court to address the Complaint. **See all ¶¶ above**

130.   **Admit**.    I admit that I have not had the good fortunate opportunity to file any income tax since I was unlawfully "Discharged" from my employment on April 6, 1992 because of unfortunate occurrences of events described above due to my race and my age at the hands of unscrupulous few. **See all ¶¶ above**

Dated April 12, 2010
New York, New York

By: _____

John Y. Kim
c/o Harry Kim
531 Eastgate Rd.
Ho-Ho-Kus, N.J 07423

51