UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
JOHN Y. KIM,

06 CV 5365 (RPP)

- against -

**OPINION AND ORDER**

COLUMBIA UNIVERSITY,

Defendant.
------------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

Plaintiff John Kim filed this lawsuit against Columbia University in July 2006, alleging unlawful employment discrimination on the basis of his race and his age, resulting in the termination of his employment.  Defendant Columbia University moved for summary judgment on February 11, 2010.

**FACTS AND PROCEEDINGS**

The Plaintiff enrolled as a student at the School of Engineering and Computer Science at Columbia University in 1986.  (Deposition of John Y. Kim, October 30, 2009 ("Kim Depo."), 95.)  At the same time, he was hired as a consultant at the Dohr Computer Lab at Columbia Business School.  (*Id.*, 96-97.)  In October 1987, he took a position as a Local Area Network Coordinator at Columbia Business School, a position that paid $19,000 as annual salary.  (*Id.*, 98.)  In June 1988, he was promoted to Manager of Microcomputer Systems, in the computing activities center at the Graduate School of Business at Columbia University.  (*Id.*, 101.)  The new position made Plaintiff an administrative officer of the University and entitled him to an annual salary of $28,000.

(*Id*.)  On May 31, 1989, he was given a raise from $28,000 to $33,500 annual salary.  (*Id*., 103.)  On June 21, 1990, the Plaintiff was promoted to Assistant Director of Microcomputer Systems and Computing Activities and was given a raise, so that his new salary was $42,000 per year.  (*Id*., 104.)  In June 1991, he was given another raise, which brought his annual salary to $44,100.  (*Id*., 105.)  The Plaintiff was released from his employment, effective April 6, 1992.  (Defendant's Exhibit ("D. Ex.") E.)

The Plaintiff self identifies as Asian-American.  (*Id*., 107.)  He was born on September 26, 1948, making him thirty-eight years old when he was hired by Columbia University, and forty-four years old when he was released from his employment.  (D. Ex. H.)

On March 27, 1991, the Plaintiff's Supervisor, Richard Sacks, Executive Director for Information Technology issued a warning letter to the Plaintiff.  (D. Ex. L.)  In the letter, Sacks stated: (1) that in November 1990 the Plaintiff had previously disappeared from his job for two days without notice; (2) that the Plaintiff had been warned after that disappearance; (3) that the Plaintiff engaged in "bouts of inappropriate and uncivil behavior toward other members of the staff"; and (4) that the letter was a "formal and final warning," which notified Plaintiff that "[a]ny further behavior of the kind that has been discussed will result in [Plaintiff's] immediate dismissal."  (*Id*.)  Sacks also testified about these instances of "uncivil, verbally abusive behavior" directed at other staff members in his deposition for this case. (Deposition of Richard Sacks, September 14, 2009 ("Sacks Depo."), 73-74.)  He described two instances in which the Plaintiff "went ballistic at other staff members and [was] yelling at them and screaming at them and verbally abusing them in the kinds of sort of personal characterizations."  (*Id*., 74-75.)  In

testimony before the New York State Division on Human Rights (SDHR), the Plaintiff disputed this characterization, testifying that he had not been warned in November 1990 and that he had not behaved uncivilly towards his co-workers as described in Sacks' letter.  (Transcript of John Kim's Testimony before the New York State Division on Human Rights ("Kim Tr."), 801-04, 1047-48.)  Plaintiff also testified at the SDHR proceeding that he was asked "to perform floating general labor, by having [him] take the trash out [and] move the furniture," and that he was the only staff member at his level who was asked to perform these "menial" tasks.  (Kim Tr. 2508-09.)

In July 1991, James Haggard replaced Sacks as the Executive Director for Information Technology.  (Kim Tr. 48.)  Haggard had testified that he instituted certain department-wide policies that required employees to fill out a form known as an internal purchase order (IPO) before making any purchases.  (Transcript of James Haggard's Testimony before the New York State Division on Human Rights ("Haggard Tr."), 1332-33.)  Haggard employed Vanessa Clark, a student at the business school, as a certified public accountant, to assist him in overseeing and controlling the budget.  (*Id*., 1328-29).  Haggard testified that Kim was resistant to these changes, and that he refused to complete the IPOs as required.  (*Id*., 1359.)

Clark testified that, on March 19, 1992, she went to the Plaintiff's office to discuss some equipment that had been purchased for which she could not locate an IPO.  (Deposition of Lori Vanessa Clark, September 15, 2009 ("Clark Depo."), 10-12.)  She testified that Plaintiff admitted that he had not completed an IPO, and that he then became upset, "got very angry and raised [his] voice."  (*Id*., 10.)  She testified that she then left his office to return to hers, and as she left, the Plaintiff either threw or kicked a

box towards her.  (*Id.*, 19.)  The box did not hit Clark, but instead hit the doorframe of her office.  (*Id.*, 31.)  Haggard also testified that he heard raised voices and saw an empty box near Clark's office door when he went to investigate.  (Kim Tr. 2485-89.)  The Plaintiff disputes this characterization, and asserts that it was Clark who raised her voice and "screamed and yelled" and that he did not throw a box toward Clark.  (*Id.*, 1051, 2506-07.)

Clark reported the incident to Haggard, who reported the incident to Rona Carr, the head of human resources at the Business School, and to his direct supervisor, Associate Dean Gerry Lewis.  (Haggard Tr. 1344, 1348-51.)  Carr recommended immediate suspension of the Plaintiff for a period of two weeks, which was agreed to by Dean Lewis.  (*Id.*, 1350-51.)  The next morning, Haggard and Carr presented the Plaintiff with a "final warning" letter suspending him and "informed him that the behavior that he had demonstrated was clearly unacceptable."  (*Id.*, 1352.)

Haggard testified that after the suspension, Carr informed him of the prior "final warning" letter and that he had not known about this letter prior to the suspension.  (*Id.*, 1365.)  After further discussions with Carr and Dean Lewis, Haggard concluded that it would be necessary to terminate the Plaintiff's employment.  (*Id.*, 1367.)  He based his decision on Clark's account of the March 19, 1992 incident, Sacks' letter, the counsel of Carr and Dean Lewis, and his discovery, during Kim's suspension, that Kim had been repeatedly violating his internal policy for the purchase of equipment.[1]  (*Id.*, 1365-67,

---

[1] Haggard testified that during Plaintiff's suspension, he asked Clark "to review the documents that were in [Plaintiff's] office that were left essentially in disarray because we had to continue the operations of the school.  We couldn't stop.  Equipment was arriving.  Things had to be continued to take care of.  She reviewed those documents, and in the course of review found some documents which in my mind were consistent with the problem of Mr. Kim following the proper procedure with paperwork."  (*Id.*, 1719.)  He

1719-21.)  Upon the Plaintiff's return to work on April 6, 1992, he was notified that his

employment with Columbia was terminated.  (*Id.*, 1367-68; D. Ex. E.)  Plaintiff has not

been employed since his release from employment with Columbia in 1992.  (Kim Tr.

973.)  He has applied for jobs, but has met with no success.  (Kim Tr. 984-85, 1009; Kim

Dep. 50-51, 139.)

 Plaintiff testified that, following the termination of his employment, Columbia

replaced him with an individual who was nineteen years old and not Asian-American.

(*Id.*, 2444, 2590).  Plaintiff also testified that in 1992, he was the only Asian-American

working at his pay grade level (or at any higher levels) in the Graduate School of

Business.  (*Id.*, 2557.)  He also testified that he was the only Asian-American in his work

unit and that, to the best of his knowledge, he was the oldest person in his work unit.  (*Id.*,

2589.)  Haggard testified that, after the termination of the Plaintiff's employment, "there

was . . . a reorganization of responsibilities" and that he ultimately hired several different

people to replace the Plaintiff.  (Deposition of James Haggard, September 15, 2009

("Haggard Depo."), 93.)  Sacks testified that there was at least one other Asian-American

in the Plaintiff's work unit during Sacks' tenure as Executive Director for Information

Technology. (Transcript of Richard Sacks' Testimony before the New York State

Division on Human Rights ("Sacks Tr."), 850-51.)

 Soon after his termination, Plaintiff wrote to Columbia University's Vice

President for Personnel Management and Human Resources, requesting a formal hearing

to contest his suspension and termination.  (D. Ex. O.)  On April 29, 1992, the Plaintiff

also filed an internal discrimination complaint, alleging discrimination on the basis of his

---

went on to describe the problem as a "substantial deviation and it was over time.  There was a history of not
following the paperwork procedures."  (*Id.*, 1720.)

race, age, and unspecified disability.  (D. Ex. P.)  A committee convened in June 1992 to consider the grievance, combined with the discrimination complaint.  (D. Ex. R.)  The committee interviewed Carr, Lewis, Haggard, Clark, and Kim.  (D. Ex. T.)  The committee prepared a draft report on June 25, 1992 that concluded: (1) "the department's action to release Mr. Kim from employment was not carried out according to proper procedure"; and (2) "[t]he department's decision that Mr. Kim's release was required may be supportable."  (*Id.*)  A second draft report was prepared on July 13, 1992, which stated that "the Graduate School of Business acted properly first in its suspension and then in its release of John Kim."  (D. Ex. U.)  A draft report prepared on September 28, 1992 contained the exact same conclusion.  (D. Ex. V.)  The final report was sent to Senior Vice President Joseph Mullinix on October 16, 1992, concluding that the suspension and release of the Plaintiff were proper.  (D. Ex. W.)  One committee member, former Dean of the Business School, Professor John C. Burton,[2] dissented from this conclusion, and wrote separately to express his concerns as to the manner in which the grievance committee reached its decision and as to the validity of the evidence presented to the committee as grounds for Plaintiff's discharge.  (D. Ex. X.)  On December 29, 1992, Senior Vice President Mullinix adopted the majority report and determined that the release of the Plaintiff from his employment would remain in place. (D. Ex. Y.)

On July 31, 1992, the Plaintiff filed a complaint against the Defendant with the New York State Division of Human Rights (SDHR), and cross-filed the same complaint with the Equal Employment Opportunity Commission (EEOC).  (D. Ex. B.)  In the

---

[2] Professor Burton was also a Chief Accountant at the Securities and Exchange Commission and Deputy Mayor of the City of New York.

complaint, he claims that he was discriminated against on the basis of his race and his age. (*Id*.)  On August 15, 1995, the SDHR issued a finding of probable cause that Columbia University had engaged in an unlawful discriminatory practice and referred the case for a public hearing.  (D. Ex. Z.)  The hearing took course over twelve days in 2002 and 2003.  On March 1, 2006, the SDHR issued an order concluding that Kim "was not fired under circumstances that give rise to an inference of unlawful discrimination" and that Columbia's "articulated reasons for firing [Kim] were not proven to be pretextual." (D. Ex. BB.)  The complaint was dismissed on the merits.  (*Id*.)  On March 29, 2006, the EEOC adopted the findings of the SDHR and issued a right to sue letter.  (D. Ex. A.)

On July 17, 2006, Plaintiff filed this lawsuit by filing a complaint alleging unlawful employment discrimination.  He filed an amended complaint on June 11, 2007 and a second amended complaint (SAC) on August 18, 2007.  The SAC alleges unlawful discrimination on the basis of Plaintiff's age and race, in violation of Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act of 1967, the New York State Human Rights Law, and the New York City Human Rights Law.  He alleged that the unlawful discrimination took the form of hostile work environment, failure to promote, unequal working conditions, retaliation, and termination.

**DISCUSSION**

Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Determining whether

factual disputes are genuine issues of fact requires the Court to inquire "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

Employment discrimination cases follow a burden-shifting framework first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  A plaintiff in a case brought under federal employment discrimination statutes "must carry the initial burden under the statute of establishing a prima facie case of . . . discrimination" based on his membership in a protected class.  *Id*. at 802.  Then, the burden shifts "to the employer to articulate some legitimate, nondiscriminatory reason for the" adverse employment action.  *Id*.  Thereafter, the plaintiff can rebut by showing "that [the employer's] stated reason for [the adverse employment action] was in fact pretext."  *Id*. at 804.

"To establish a prima facie case of age discrimination under the ADEA, a claimant must demonstrate that: 1) he was within the protected age group; 2) he was qualified for the position; 3) he was subject to an adverse employment action; and 4) the adverse action occurred under circumstances giving rise to an inference of discrimination."  *Terry v. Ashcroft*, 336 F.3d 128, 137-38 (2d Cir. 2003) (internal quotation marks and citations omitted).  These four elements are the same for cases alleging racial discrimination in violation of Title VII of the Civil Rights Act.  *See McDonnell Douglas Corp.*, 411 U.S. at 802.

"Circumstances giving rise to an inference of discrimination" include " actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory

animus, preferential treatment given to employees outside the protected class, and, in a corporate downsizing, the systematic transfer of a discharged employee's duties to other employees or a pattern of recommending the plaintiff for positions for which he or she is not qualified and failure to surface plaintiff's name for positions for which he or she is well-qualified." *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996) (citations omitted).  "In the age-discrimination context, such an inference cannot be drawn from the replacement of one worker with another worker insignificantly younger. Because the ADEA prohibits discrimination on the basis of age and not class membership, the fact that a replacement is substantially younger than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class." *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 313 (1996); *see also Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 78 (2d Cir. 2005). The inference of discrimination standard is different in Title VII cases: "the mere fact that a plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination at the prima facie stage of the Title VII analysis." *Zimmermann v. Assoc. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001).

## A. Plaintiffs' Hostile Working Environment Claim

Plaintiff did not raise a claim for hostile work environment in his complaint filed with the SDHR and the EEOC.  (D. Ex. B.)  He focused exclusively on his termination, and listed as the dates of discrimination only April 6, 1992.  (*Id.*)

A plaintiff filing a Title VII claim in federal court must exhaust administrative remedies by filing a timely complaint with the EEOC.  *Deravin v. Kerik*, 335 F.3d 195,

200 (2d Cir. 2003).  Claims not asserted before the EEOC are not properly raised in federal court unless "they are reasonably related to those that were filed with the [EEOC]."  *Id.*   A claim is reasonably related if the facts described in the EEOC complaint give notice of the claim to the EEOC.  *Id.*  In *Deravin v. Kerik*, the Second Circuit determined that, where a complainant had indicated that discrimination was only on the basis of national origin in his EEOC complaint, he was not barred from later claiming discrimination on the basis of his race.  *Id.* at 203.  The Second Circuit concluded that "an allegation of preferential treatment for Irish-American employees fairly encompasses a claim of discrimination against minority employees."  *Id.*

Here, the plaintiff's hostile work environment claim is based on his factual assertions that he was asked to perform general labor, such as taking out the trash and moving the furniture.  There is nothing in his EEOC complaint which would have alerted the EEOC to the facts underlying the Plaintiff's claim of a hostile working environment.  Instead, the Plaintiff quite explicitly limited his allegations of discrimination to one day: April 6, 1992.  Thus, Plaintiff's hostile working environment claim cannot be said to be "reasonably related" to the claims raised in his EEOC complaint. The Plaintiff has failed to exhaust his administrative remedies and is barred from raising this new claim.  Therefore, the Defendant's motion for summary judgment as to this claim is granted.[3]

## B. Plaintiff's Failure to Promote Claim

Plaintiff has pointed to no specific instances in which he was eligible for promotion but was not promoted.  There is, quite simply, no evidence that Columbia

---

[3] This holding does not mean, however, that the Plaintiff may not raise evidence at trial that he was asked to perform menial labor to support his claim that Columbia's proffered reason for his termination was pretextual and that the real reason was because of Plaintiff's age or race.

University ever failed to promote him.  To the contrary, the record shows that the Plaintiff was promoted multiple times and that his salary more than doubled during his five years as an employee of Columbia University.  Therefore, the Defendant is entitled to summary judgment on this claim.  *See Anderson*, 477 U.S. at 251-52.

**C. Plaintiff's Termination Claim**

Plaintiff has established a prima facie case of discrimination on the basis of his race.  The parties agree that: 1) Plaintiff is Asian-American; 2) Plaintiff was qualified for the position he held; and 3) Plaintiff was subject to an adverse employment action.  The only issue is whether his termination "occurred under circumstances giving rise to an inference of discrimination." *Terry*, 336 F.3d at 138.  Plaintiff has testified that he was replaced by an individual who was not Asian-American.  (Kim Tr. 2590.)  Under *Zimmermann*, this "suffices for the required inference of discrimination at the prima facie stage of the Title VII analysis."  251 F.3d at 381.

Plaintiff has also established a prima facie case of discrimination on the basis of age.  The parties agree that: 1) Plaintiff was over forty years old at the time of his termination; 2) Plaintiff was qualified for the position he held; and 3) Plaintiff was subject to an adverse employment action.  Thus, the remaining issue is whether Plaintiff can point to facts showing that his termination "occurred under circumstances giving rise to an inference of discrimination." *Terry*, 336 F.3d at 138.  Plaintiff has testified that he was replaced by someone who was nineteen years old, as compared to his forty-four years of age.  (Kim Tr. 2444.)  Here, with such a vast age discrepancy and taking the evidence in the light most favorable to the non-movant, Plaintiff has met his burden of establishing an inference of discrimination.  *See Woodman*, 411 F.3d at 78 ("The far

more reliable indicator of age discrimination is the age discrepancy between the discharged employee and her replacement. Thus, it is that discrepancy as to which an employer must have some knowledge to support an inference of discriminatory intent.").

Columbia University has articulated a "legitimate, nondiscriminatory reason for" its decision to terminate the Plaintiff. *McDonnell Douglas Corp.*, 411 U.S. at 802. The stated reasons are Plaintiff's uncivil and hostile interactions with his fellow employees, culminating in the March 19, 1992 incident, and his apparent refusal or failure to fill out the required purchasing forms. (Defendant's Memorandum of Law in Support of Columbia University's Motion for Summary Judgment ("Def. Mem."), 14.) This is a legitimate and nondiscriminatory reason, and Columbia University has pointed to ample evidence in the record that suffices to meet its burden under the *McDonnell Douglas* burden-shifting regime.

The Plaintiff has pointed to evidence that suggests that the Defendant's articulated reason is a pretext, namely his testimony that: (1) he had not behaved uncivilly towards his co-workers, as described in the Sacks letter; (2) Clark yelled at him, but he did not yell at her during the March 19, 1992 incident; (3) he did not throw a box at Clark on March 19, 1992; and (4) Haggard's claim that Plaintiff violated internal purchasing policies was incorrect. (Kim Tr. 801-04, 1047-48, 1051, 2506-07.) The Supreme Court has stated that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."[4] *Reeves v. Sanderson Plumbing Prod., Inc.*,

---

[4] In that same case, the Court went on to identify two exceptions to this general rule: (1) where the record reveals a second "nondiscriminatory reason for the employer's decision" in a conclusive manner; and (2) where there is "abundant and uncontroverted independent evidence that no discrimination had occurred."

530 U.S. 133, 148 (2000).  Under this standard, the question of whether or not the proffered legitimate reason for the Plaintiff's termination was pretextual is reserved for a jury.  Therefore, the Defendant's motion for summary judgment as to the Plaintiff's claims of discrimination, under Title VII of the Civil Rights Act and the ADEA, resulting in his termination is denied.[5]

**D. Plaintiff's Retaliation Claim**

"To establish a prima facie case of retaliation, an employee must show [1] participation in a protected activity known to the defendant; [2] an employment action disadvantaging the plaintiff; and [3] a causal connection between the protected activity and the adverse employment action."  *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998).  "Proof of the causal connection can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988).

Plaintiff claims that he was retaliated against for engaging in protected activity, namely filing a complaint with the EEOC (which was referred to the SDHR) on July 31, 1992.  Specifically, he alleges in his complaint that he was told by the Grievance Committee on June 23, 1992 that he would be reinstated, but that Columbia University

---

*Id.*  Neither circumstance is present here.  Defendants have not pointed to a second, alternative reason, and has not pointed to any evidence that is uncontroverted by Plaintiff's testimony that he did not engage in uncivil behavior with his colleagues and that the account given by Clark and Haggard of the March 19 incident was wholly inaccurate.

[5] The Defendant also argues that the Court should grant summary judgment because the Plaintiff has failed to mitigate his damages.  Plaintiff testified that he has diligently attempted to find work; while it is surprising that he has had no success over the last eighteen years, it is not appropriate at this stage to conclude that he failed to mitigate his damages.  *See Dailey v. Societe Generale,* 108 F.3d 451, 456 (2d Cir. 1997) (mitigation involves a reasonableness inquiry and is a question for the jury).

retaliated against him for filing the discrimination complaint by making his termination

final on September 28, 1992.  (SAC ¶¶ 43, 51, 54.)  However, he has pointed to no

evidence controverting the Defendant's submission of the draft committee reports, which

show that while the Committee agreed that his termination was improper on June 25,

1992, it changed its recommendation and determined that the termination was proper on

July 13, 1992.  (D. Ex. T, U.)  In other words, the decision to recommend that termination

not be overturned was made nearly twenty days before the Plaintiff filed his complaint

with the SDHR and the EEOC.  To the extent that the Plaintiff has met his burden of

establishing the first two elements of a prima facie case of unlawful retaliation, he has not

established a causal connection between the protected activity and the decision to

terminate his employment.[6]  Therefore, the Defendant's motion for summary judgment as

to the Plaintiff's retaliation claim is granted.

### E. Plaintiff's New York State Human Rights Law Claim and New York City Human Rights Law Claim

New York law deprives this Court of subject matter jurisdiction over state and

city law claims that have already been brought before the SDHR.  N.Y. Exec. Law §

297(9); N.Y.C., Admin. Code § 8-502(a); *Moodie v. Fed. Reserve Bank of N.Y.*, 58 F.3d

879 (2d Cir. 1995).  To the extent that the Plaintiff has raised state or city claims in this

Court that were not raised before the SDHR, those claims were raised fourteen years after

the incidents giving rise to them occurred.  They are therefore time barred in that the

statute of limitations under both the state and city anti-discrimination laws is three years.

*See* N.Y. C.P.L.R. § 214(2); N.Y.C., Admin. Code § 8-502(d); *Quinn v. Green Tree*

---

[6] To the extent that his filing of an internal complaint of discrimination in April 29, 1992 was a protected activity, his actual termination occurred before that complaint was filed.  Plaintiff has not pointed to any evidence that suggests that the actions taken by the committee were discriminatory or otherwise unlawful.

*Credit Corp.*, 159 F.3d 759, 765 (2d Cir. 1998).  The Defendant's motion for summary judgment as to the Plaintiff's state and city law claims is granted.

**F. Plaintiff's Breach of Contract Claim**

Plaintiff admits in his 56.1 statement that he "was  an employee 'at will' and had no written contract of employment with Columbia."  (Plaintiff's Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 ¶ 5.)  This admission, in and of itself, bars Plaintiff's claim that Columbia breached its contract with him.

However, even if it were substantively meritorious, this claim would still fail, because Kim raised it for the first time in the SAC which was filed fifteen years after his termination and well after the expiration of the six-year statute of limitations for contract claims.  N.Y. C.P.L.R. § 213(2).

The Defendant's motion for summary judgment as to the Plaintiff's claim for breach of contract is granted.


**CONCLUSION**

The Defendant's motion for summary judgment is granted in part and denied in part.  The parties will file a pre-trial order based on this opinion by July 23, 2010 and be ready for trial on August 16, 2010 at 9:30 a.m.  The pro bono lawyer panel for pro se plaintiffs will be advised of this opinion.


IT IS SO ORDERED.

Dated:  New York, New York
        July __, 2010

15

July 1, 2010

Robert P. Patterson, Jr.

U.S.D.J.

16

Copies of this order were sent to:

**The Plaintiff:**
**John Y. Kim**
531 East Gate Rd.
Ho Ho Kus, NJ 07423

**Counsel for the Defendant:**
**Laura Dawn Barbieri, Alycia Sarah Levy, Beth L. Kaufman, Charles B. Updike**
Schoeman, Updike & Kaufman, LLP
60 East 42 Street
39th Floor
New York , NY 10165
Fax: 212-687-2123